Filed 1/21/14  Ponce v. Philco Construction CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ABRAHAM VICTOR PONCE, | |
| Plaintiff, Cross-defendant and Respondent, | G049097 |
| v. | (Super. Ct. No. RIC 521704) |
| PHILCO CONSTRUCTION, INC., et al., | O P I N I O N |
| Defendants, Cross-complainants and Appellants. | |

Appeal from a judgment of the Superior Court of Riverside County, Jacqueline C. Jackson, Judge.  Affirmed as modified.

Ward & Ward and Alexandra S. Ward; Desjardins & Panitz and Michael A. Desjardins for Defendants, Cross-complainants and Appellants.

Murchison & Cumming, Michael D. McEvoy and Maria A. Starn; Wilson, Elser, Moskowitz, Edelman & Dicker and Peter Hughes for Plaintiff, Cross-defendant and Respondent.

\*      \*      \*

Certified Tire & Service Centers, Inc. (Certified) hired general contractor Philco Construction, Inc. (Philco) to build an automobile service store location in Moreno Valley, California (the Project). Philco, in turn, entered into an agreement with subcontractor Abraham Victor Ponce (Ponce), obligating Ponce to perform concrete and masonry work on the Project in exchange for $150,000. Because he was not paid the full contract price, Ponce sued Philco and Certified (collectively, defendants), seeking payment of the remaining amount owed to him pursuant to the terms of the subcontract. Defendants claimed that partial nonpayment was justified due to alleged defects in the concrete slab poured by Ponce. Indeed, defendants filed cross-complaints seeking damages and/or indemnification from Ponce to cover the costs of remediating the alleged defects in the concrete slab and delay associated therewith.

A jury awarded Ponce $92,023.64 in damages against defendants (plus interest and costs) and rejected the causes of action asserted in cross-complaints against Ponce. We disagree with defendants' claims on appeal that they are entitled to a new trial based on either (1) the admission of evidence pertaining to Certified's business practices, or (2) alleged instructional and special verdict form error. But we modify the judgment to eliminate the award of attorney fees to Ponce and against Philco. The subcontract clearly indicates that the parties "shall" resolve all controversies arising out of the subcontract in arbitration and that "[t]he arbitrator shall have the authority to award reasonable attorneys fees." The parties did not arbitrate the matter. The subcontract did not authorize the trial court to award attorney fees to the prevailing party at trial.

FACTS

Certified sells automotive products and performs automobile repairs at its 28 locations. After deciding to build a Moreno Valley location, Certified hired architect Al Aguirre to design the Project. Aguirre's architectural plans were completed in March

2

2008. In May 2008, Certified hired Philco as general contractor for the Project, based on a bid of $650,000 by Philco to deliver "a completed store ready to open for business."

Ponce is a licensed general and masonry contractor. In June 2008, Ponce and Philco entered into a subcontract with regard to concrete and masonry work at the Project. The subcontract provided, "The Project shall be built according to the plans and specifications."

The subcontractor's scope of work included the pouring of a rebar reinforced concrete slab. The concrete slab is the floor surface of the building. Ponce poured the concrete slab in August 2008. Ponce also cut control joints in the concrete slab with a specialized saw immediately after pouring the concrete ("about two hours after the final pour"). Control joints are used to minimize the natural tendency of concrete to crack. Ponce then water cured the concrete slab for three days pursuant to the schedule prepared by Philco. The field superintendant for Philco continued to water the concrete slab after Ponce's work.

Ponce completed all specified work on the Project by the end of November 2008. Ponce was paid $67,500 by November 2008, but was not paid the $82,500 balance on the subcontract or $9,523.64 for a series of change orders that increased the costs of Ponce's work. Certified became concerned about several issues with the concrete slab, including cracks in the slab, damage to the control joint edges, and a mottled appearance that was unattractive. Ponce was not notified of any alleged problems with the concrete slab until December 2008. Ponce never received any complaints about the remainder of the work he performed at the Project.

In February 2009, Ponce recorded a mechanic's lien against Certified's interest in the property on which the Project was constructed. Ponce then filed a complaint against Philco and Certified in March 2009. A parade of cross-complaints followed, pursuant to which each party sued the other parties for both damages and

indemnity. Prior to trial, however, Philco and Certified settled their claims against each other and presented a united front against Ponce at trial.

The jury was provided with special verdict forms pertaining to the parties' claims. The jury found Philco breached its contract with Ponce and damaged Ponce in the amount of $92,023.64. The jury separately found that Ponce had recorded a valid mechanic's lien and was owed $92,023.64. Finally, the jury found that Ponce was not negligent and that Philco did not perform its obligations pursuant to the subcontract, thereby rejecting defendants' claims against Ponce. Judgment was entered in November 2011, awarding Ponce (as against Philco) $92,023.64 in damages, $21,884 in interest, $172,850.02 in attorney fees, and $68,829.67 in costs. Certified was held responsible for the damages and interest amount, but not the attorney fees or costs. Certified was separately ordered to pay $16,904.28 in costs. Both Certified and Philco were held jointly and severally liable for costs in the amount of $51,925.48 regarding Ponce's successful defense of the cross-complaints. The judgment also declared the validity of Ponce's lien on Certified's property interest and provided for public auction of the property interest to satisfy $130,811.92 of the judgment.

## DISCUSSION

*No Error in Admission of Evidence of Certified's Checkered History with Consumers*

Defendants claim the court committed prejudicial error by admitting into evidence certain exhibits during the cross-examination of Certified's president, Jeff Darrow. The exhibits cast an unfavorable light on Certified's business practices: (1) Exhibit No. 2301, a Bureau of Automotive Repair publication listing disciplinary actions against various service stations in the summer of 2006, including 15 Certified locations; (2) exhibit No. 2302, a May 2008 final judgment pursuant to stipulation (signed by Certified and Darrow, on one side, and the District Attorneys of Orange, Riverside, and

4

San Bernardino Counties on the other), which set forth a civil penalty of $550,000 against Certified and Darrow, provided for restitution to Certified customers, and established enhanced monitoring protocols of Certified by the district attorneys; and (3) exhibit No. 2303, a minute order reflecting the filing of the final judgment introduced as exhibit No. 2302. According to defendants, these exhibits showcased "evidence of specific instances of" past conduct and were therefore improperly admitted to undermine Darrow's credibility (Evid. Code, § 787);[1] moreover, the documents were unduly prejudicial (§ 352).

According to Ponce, Darrow's testimony about the operation of Certified opened the door to the admission of exhibits Nos. 2301, 2302, and 2303. On direct examination by defendants' counsel, Darrow testified about the "most important principles" he followed "to grow" Certified, including organization, standardized policies at all stores, employee professionalism, and cleanliness of the store. The image of Certified was very important to Certified's success. According to Darrow, "the condition of the floor in the shop" "has a tremendous impact" on employee discipline and safety. And the appearance of the concrete floor in the automobile service area is also important to the image presented to customers, according to Darrow. On cross-examination, Darrow agreed with the following leading question, "And you train [your employees] to treat the customers fairly and honestly; right?"

Following this testimony, Ponce sought to introduce exhibit Nos. 2301 through 2303, other litigation documents from the Attorney General lawsuit, a newspaper article, and a district attorney press release. The court stated it was inclined to admit exhibit No. 2301 as "relevant to impeach testimony given by Mr. Darrow" but disinclined to admit the newspaper and press release documents because of the prohibition against

---

[1]     All statutory references are to the Evidence Code, unless cited otherwise.

hearsay.  The court also allowed exhibit Nos. 2302 and 2303, but deemed cumulative and confusing the remainder of the litigation documents.

Defense counsel objected pursuant to sections 787 and 352.  The court overruled the objections.  "I think when a witness testifies that part of the image of the business is important, and that's why a slab is rejected, because it doesn't comport with the image that they wish to portray, and that image is described in detail, and apparently other issues of customers aren't as important [as] image.  [¶]  From what I'm reading from the [Bureau of Automotive Repair] documents and the suspension, it overlaps our time frame by a year.  It actually starts at the last year of the suspension.  It deals directly with customers and customer issues."  "And I find that it's relevant to credibility.  Credibility is always an issue with every witness, and it's quite clear under [section] 785 . . . that any party can attack or support credibility of a witness, and it is coming in."  "Mr. Darrow is unquestionably a very successful businessman, and [he] discussed at length what went into that success.  [The exhibits are] proper impeachment for part of that."  The court agreed with Ponce's counsel that the exhibits relate "to [Darrow's] testimony as far as his success in building the business, that his employees treat the customers fairly and honestly [¶] . . . [¶] and [Darrow] trains them to do that."  Darrow was then questioned by Ponce's counsel as to the contents of these exhibits.

We review the court's ruling as to the admissibility of the exhibits for an abuse of discretion.  (*Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317.)  "'While the concept "abuse of discretion" is not easily susceptible to precise definition, the appropriate test has been enunciated in terms of whether or not the trial court exceeded '"the bounds of reason, all of the circumstances before it being considered. . . .'"' [Citations.]' [Citation.]  'A decision will not be reversed merely because reasonable people might disagree.  "An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge."  [Citations.]  In the absence of a clear showing that its decision was arbitrary or

6

irrational, a trial court should be presumed to have acted to achieve legitimate objectives and, accordingly, its discretionary determinations ought not be set aside on review.'" (*Gouskos v. Aptos Village Garage, Inc.* (2001) 94 Cal.App.4th 754, 762.)

"[A]lthough '"evidence of a specific instance of a witness's conduct is inadmissible under . . . section 787 to impeach the witness as proof of a trait of his character [it] may become admissible to impeach the witness pursuant to Evidence Code section 780, subdivision (i), by proving *false* some portion of his testimony."'" (*Andrews v. City and County of San Francisco* (1988) 205 Cal.App.3d 938, 946.) "California's Evidence Code, adopted in 1965, did away with the common law rule [that a party cannot be impeached on a collateral fact]. Section 351 states 'all relevant evidence is admissible' and section 780 provides that 'in determining the credibility of a witness' the trier of fact 'may consider . . . : [¶] . . . [¶] (i) The existence or nonexistence of any fact testified to by him.' The effect of these two statutes 'is to eliminate this inflexible rule of exclusion.' [Citation.] In its place 'the court has substantial discretion to exclude collateral evidence' under section 352." (*People v. Morrison* (2011) 199 Cal.App.4th 158, 164.)

It is plausible to argue that Certified's treatment of its customers and training of its employees is irrelevant to the primary issue presented in this case, i.e., whether the concrete slab poured by Ponce was defective. And it is obvious that the contested exhibits were prejudicial to Certified. But defendants made the question of Certified's image an issue in this case on direct examination conducted by defense counsel. Darrow testified in depth about the astronomic growth of Certified and the lofty principles that supposedly drove that growth. (See *Andrews v. City and County of San Francisco*, *supra*, 205 Cal.App.3d at p. 946 ["a witness who makes a sweeping statement on direct or cross-examination may open the door to use of otherwise inadmissible evidence of prior misconduct for the purpose of contradicting such testimony"].) Darrow's testimony was designed to promote a positive view of Darrow and Certified.

The only conclusion to be drawn from Darrow's initial testimony was that he ran a professional, squeaky clean operation. The court reasonably concluded that Darrow's testimony on direct examination was intended to illustrate why Certified could not accept the concrete slab and why it was entitled to the damages claimed in the cross-complaints. Ponce impeached Darrow's testimony with evidence supporting inferences that Certified did not have a pristine image and that some of Certified's success might be attributed to less admirable business practices. This evidence arguably impeached Darrow's credibility because it conflicted with the picture of Certified he painted in his testimony. Had Darrow scrupulously stuck to testifying about the concrete slab and not introduced a narrative designed to elicit the admiration of the jury, perhaps we would rule differently. But on this record, the court did not abuse its discretion by deeming the exhibits to be proper impeachment evidence that was not unduly prejudicial.

Defendants argue that the court erred because Ponce should not have been allowed to create his own basis for impeachment through cross-examination. (See *Bowman v. Wyatt* (2010) 186 Cal.App.4th 286, 327 [court erred by allowing plaintiff to first inquire into, then impeach testimony of witnesses on irrelevant matter]; *Winfred D. v. Michelin North America, Inc.* (2008) 165 Cal.App.4th 1011, 1029-1035 [court erred by allowing defendant to introduce irrelevant matter of plaintiff's bigamy by claiming it impeached the plaintiff's false deposition testimony about the identity of his second and third wives].) Certainly, Ponce's counsel set up the introduction of the exhibits by asking Darrow whether it was true Darrow trained his employees "to treat the customers fairly and honestly." Darrow's training of Certified's employees is far afield from the issues in this case. Were this the only basis for court's ruling, we might well reach a different result. But as discussed above, the exhibits were admissible to impeach Darrow as to his picture of Certified's image presented during his direct examination.

*No Reversible Error in Jury Instructions or Special Verdict Form*

In its cross-complaint, Certified sued Ponce for negligence resulting "in a defective concrete slab and footings in the improvement." Certified claimed it suffered damages greater than $500,000 as a result of the defective work and delay associated therewith. In response to these allegations, Ponce posited that his work was not defective and, alternatively, that any imperfection was "the result of an inadequate design which called for a low-grade concrete slab, improper and unevenly spaced hoist block-outs in the shop area formed by the owner's contractor, . . . and Philco and Certified's use of heavy equipment . . . on the concrete slab prior to applying a concrete sealer."

Defendants contend that the court committed instructional error and error in a special verdict form submitted to the jury with regard to Certified's negligence claim against Ponce. Defendants do not take issue with (or even address) the general proposition that a subcontractor may not be held liable for "defective plans and specifications procured by the owners." (*Kurland v. United Pac. Ins. Co.* (1967) 251 Cal.App.2d 112, 117-119.)

Instead, defendants assert it was error to allow the jury to find Aguirre (the architect hired by Certified) to be negligent and to apportion liability to Aguirre. Aguirre is a professional architect subject to a standard of care that was not specifically discussed by an expert witness at trial. (See *Wilson v. Ritto* (2003) 105 Cal.App.4th 361, 366-370 [court rightly denied defendant doctor's motion to add nonparty doctor as additional tortfeasor to special verdict form because there was not substantial evidence that the nonparty doctor violated his medical standard of care]; see also *Chakalis v. Elevator Solutions, Inc.* (2012) 205 Cal.App.4th 1557, 1568-1573 [plaintiff entitled to new trial because jury deemed nonparty doctor to be 52 percent at fault without expert testimony establishing causation]; *Huber, Hunt & Nichols, Inc. v. Moore* (1977) 67 Cal.App.3d 278, 313 ["Ordinarily, where a professional person is accused of negligence in failing to adhere to accepted standards within his profession the accepted standards must be

9

established only by qualified expert testimony"].)  As explained in depth in the briefs, there was ample expert testimony assessing the plans for the Project (particularly with regard to the concrete slab specifications) and the execution of the plans by the various parties and nonparties.  But it does not appear that any expert testified to Aguirre's standard of care in preparing the architectural plans for the Project. Defendants argue it was Ponce's obligation to put on expert testimony of an architect's standard of care (*in addition* to expert testimony directly addressing the quality of the concrete slab and the specifications for that concrete slab, which was provided) before he could point to Aguirre as the cause of any design defect.[2]

Nothing in the record suggests defendants raised their appellate contention with the trial court.  The parties *jointly* submitted a package of proposed jury instructions to the court.  At issue in this appeal are seven special jury instructions; defendants marked their agreement to six of these instructions, the gist of which was to suggest that Ponce should not be held liable for defects in the design of the concrete slab.[3]

---

[2] Defendants also suggest Ponce was required to sue Aguirre and meet the pleading requirements attendant upon a lawsuit against a professional (Code Civ. Proc., § 411.35) before he could blame Ponce for a design defect. Even assuming Ponce could sue Aguirre (see *Weseloh Family Ltd. Partnership v. K.L. Wessel Construction Co., Inc.* (2004) 125 Cal.App.4th 152, 158-159 [affirming summary judgment in favor of design professional sued by parties lacking privity with design professionals (who were hired by a nonparty subcontractor) for lack of duty]), we reject the argument (made without citation to relevant authority) that a cross-defendant is required to sue a professional before requesting the jury to apportion fault to that professional in a negligence special verdict form.

In addition, defendants reason that because Ponce would have been jointly and severally liable for economic damages (Civ. Code , § 1431 et seq.) in the first instance (see *DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 602-603), any "apportionment" in the special verdict form was wrongful.  But this ignores the indemnity claims brought by the parties against each other, and potential indemnity issues arising out of the relationships of the parties to the listed nonparties.

[3] Special Instruction No. 4, "When a subcontractor's work is completed in a good and workmanlike manner according to plans and specifications provided by the

10

Defendants objected to the following special instruction: "If you find that a particular defect in construction at the subject project was the result of defects in the design plans provided by general contractor Philco . . . and/or owner Certified . . . and Abraham Ponce constructed that part in conformance with the plans, then you must return a verdict in favor of subcontractor Ponce who constructed that particular part for general contractor Philco . . . and/or owner Certified . . . ." The only reasonable inference from the record is that defendants objected to the form of the instruction (i.e., "if you find . . . then you must") rather than the substance of the instruction (which is similar to the other instructions). The parties and the court discussed jury instructions and jury verdict forms off the record.

The special verdict form first queried whether Ponce was negligent, to which the jury responded, "No." The special verdict form next asked whether Philco was negligent, to which the jury responded, "Yes." Based on an affirmative response to one of these two initial questions, the special verdict form instructed the jury to answer the

---

general contractor and/or owner, the subcontractor is not responsible for the suitability of the final product, nor is the subcontractor liable if the completed work is defective." Special Instruction No. 5, "A 'design defect' is a condition arising out of its design which renders the property, when constructed substantially in accordance with its design, inherently unfit, either wholly or in part, for its intended use." Special Instruction No. 6, "A subcontractor is not legally responsible for a condition needing repair which is the result of following the plans and specifications contained in the subcontract with the general contractor or provided to it by the general contractor and/or owner." Special Instruction No. 7, "A subcontractor is not legally responsible for defects in the plans and specifications, or for suitability of the materials that are selected and that resulted in defects in the final product itself." Special Instruction No. 8, "Abraham Ponce is not liable if he merely carried out the plans, specifications and directions given by the general contractor and/or owner. In such a case, the responsibility is assumed by the general contractor and/or owner, who have nondelegable liability for the design defects resulting from its plans, specifications, and directions." Special Instruction No. 9, "The project's design defects, if any, are the responsibility of the general contractor Philco, owner Certified . . . , and/or its design professionals. Subcontractors such as Abraham Ponce are not obligated to indemnify the general contractor, owner and/or design professionals for design defects."

11

remainder of its questions. The jury then found Certified was harmed in the amount of $23,312, which consisted solely of delay damages. The jury rejected Certified's claim that it was harmed by either the costs of repair or the cost of future repair. On appeal, defendants criticize subsequent questions in the special verdict form asking the jury whether various parties and nonparties (the architect Aguirre and several others) were negligent and to apportion percentages of responsibility to the various parties and nonparties for harm to Certified. The jury apportioned the following percentages of fault to the parties and nonparties for the harm suffered by Certified: Ponce (0 percent), Philco (50 percent), Certified (15 percent), Aguirre (30 percent), Weber Equipment (5 percent), and other third parties (0 percent).

The record does not definitively indicate which party or parties drafted the special verdict form (although it appears from a comment made by counsel for Ponce that it was Ponce). Counsel for defendants had not submitted a proposed special verdict form at the time of the comment by Ponce's counsel; he stated he had not yet seen Ponce's proposed special verdict form but he planned to look at it. There is no suggestion in the record that defendants objected to the special verdict form or provided an alternate special verdict form. Indeed, during a pretrial hearing, counsel for defendants (in the context of advocating to keep Philco's cross-complaint before the jury) argued that Ponce "could say it's partially Philco's fault. They could say it's partially the architect's fault. They could say it's partially . . . some third party that isn't even related to this." "But that's typical, when you start talking about apportionment of negligence, for the jury to determine amongst the universe of potential actors out there who all contributed to the harm."

Defendants invited or waived any potential error in the jury instructions. With one exception, the instructions contested on appeal were jointly requested. "Consequently, the claim of error may not be raised since it comes within the doctrine of invited error. A party may not complain of the giving of instructions which he has

12

requested." (*Gherman v. Colburn* (1977) 72 Cal.App.3d 544, 567; see also *Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1000 ["a party who requests, or acquiesces in, a particular jury instruction cannot appeal the giving of that instruction"].) If defendants invited error with regard to six of the instructions, any error with regard to the seventh, objected to instruction cannot have been prejudicial on the grounds argued in this appeal (i.e., that the instructions allowed the jury to shift blame to Aguirre). The only apparent difference in the objected to instruction was its "if . . . then" phraseology, a ground not asserted as the primary source of prejudice on appeal.

Even ignoring defendants' invited error with regard to the jury instructions, defendants waived their right to instructions that specifically addressed the architect, Aguirre (as opposed to the general question of a subcontractor's liability for executing the design provided by the general contractor or owner). If "the 'trial court gives a jury instruction which is prejudicially *erroneous as given*, i.e., which is an incorrect statement of law, the party harmed by that instruction need not have objected to the instruction or proposed a correct instruction of his own in order to preserve the right to complain of the erroneous instruction on appeal.' [Citations.] Any holding making it ""the duty of a party to correct the errors of his adversary's instructions . . . would be in contravention of Section 647, Code of Civil Procedure, which gives a party an exception to instructions that are given . . . ."" [Citation.] [But] a party is deemed to waive a right to challenge an instruction on appeal for failure to request an additional or qualifying instruction to an instruction given by the court which, though correct as far as it went, was too general for the state of the evidence." (*National Medical Transportation Network v. Deloitte & Touche* (1998) 62 Cal.App.4th 412, 428.) Aguirre is not specifically mentioned in the jury instructions. Defendants' argument on appeal is wholly addressed to the problem of assigning blame to Aguirre without expert testimony as to his standard of care. Defendants do not argue that Ponce was precluded from pointing to Certified, Philco, or nonarchitect third parties as the source of the alleged defect in the concrete slab.

13

Defendants also waived their challenge to the special verdict form. A party waives "any objection to the special verdict form by failing to object before the court discharge[s] the jury." (*Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 131; see also *Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1685–1687 [inconsistent verdict error waived partly because of jointly drafted special verdict form].) As previously noted, no objection to the special verdict form appears in the record.

Finally, even assuming error occurred and was not invited or waived, such error was not prejudicial. "[T]he judgment must be affirmed unless appellant can show an [instructional or special verdict form] error that was so prejudicial a miscarriage of justice occurred." (*Austin B. v. Escondido Union School Dist.* (2007) 149 Cal.App.4th 860, 872.) An error "generally does not warrant reversal unless there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.)

On the first line of the negligence special verdict form, the jury stated that Ponce was not negligent. Logically, this was the end of the jury's assessment of Ponce with regard to Certified's negligence cause of action. The jury either agreed with Ponce that the concrete slab was not defective when it was completed by Ponce or agreed with Ponce that he had completed his tasks in accordance with the specifications provided to him by Philco. The jury then found that Philco was negligent, obligating the jury to answer the remaining questions on the verdict form. Had the jury not found Philco to be negligent, the jury never would have assessed Aguirre's fault pursuant to the special verdict form. Any assessment of Aguirre's negligence or apportionment of harm to Aguirre in the remainder of the special verdict form could not affect the jury's initial finding that Ponce was not negligent.

14

Next, the jury determined Certified's total damages. The damages found by the jury consisted solely of $23,312 in delay damages; the jury found no damages had been suffered by Certified for repair of the concrete slab in the past or in the future. The jury's verdict suggests it did not think there was anything wrong with the concrete slab as delivered by Ponce. Defendants make no attempt in their briefs to explain how the inclusion of Aguirre on the special verdict form could have possibly caused the jury to wrongly conclude that there was no defect in the concrete slab (which is the implication from its finding that Certified was not damaged by the need to repair the concrete slab).

Finally, the jury was asked to apportion responsibility to the various parties and nonparties in the special verdict form. The jury indicated Ponce was zero percent responsible, then found Philco to be 50 percent at fault, Certified to be 15 percent at fault, Weber Equipment to be five percent at fault, and Aguirre to be 30 percent at fault for the (delay) damages suffered by Certified. Nothing in the record suggests the jury could have logically shifted the fault attributed to Aguirre over to Ponce had all mention of Aguirre been excluded from the special verdict form. Instead, the structure of the special verdict form and the jury's findings suggest that the fault attributed to Aguirre by the jury would have been shifted to Certified and/or Philco, the parties with a closer connection to Aguirre's design of the Project. Certified and Philco are not seeking retrial vis-à-vis each other (they settled with each other prior to trial); the only claim on appeal is that defendants were prejudicially affected with regard to Ponce. We reject defendants' contention of prejudicial error.

*Award of Attorney Fees Not Authorized by Subcontract*

Finally, Philco asserts the court erred by awarding attorney fees to Ponce. "California follows what is commonly referred to as the American rule, which provides that each party to a lawsuit must ordinarily pay his own attorney fees." (*Trope v. Katz* (1995) 11 Cal.4th 274, 278.) But "[a] prevailing party is entitled to attorney fees when

15

authorized by statute or contract." (*Bear Creek Planning Committee v. Ferwerda* (2011) 193 Cal.App.4th 1178, 1185.) There was no statutory claim at issue in this case that would entitle a prevailing party to attorney fees.

The subcontract between Ponce and Philco included the following provision: "Arbitration. *All controversies out of this Project and this Agreement shall be resolved through mandatory, binding arbitration*, which shall be had in accordance with the rules of the American Arbitration Association existing at the time the request for arbitration is filed. The arbitrator shall be empowered to decide the controversy and issue a binding award, even if one or more parties declines, neglects or refuses to participate in the arbitration. *The arbitrator shall have the authority to award reasonable attorneys fees*." (Italics added.)

Notwithstanding the arbitration clause, Ponce filed suit in state court and Philco did not seek to compel arbitration. After the jury found in favor of Ponce, the court awarded attorney fees in Ponce's favor and against Philco in the amount of $172,850.02. The court cited several reasons for its award of attorney fees: (1) the contract authorizes the award of fees (by the arbitrator); (2) Ponce and Philco both requested attorney fees in their pleadings, specifically citing the clause quoted above; (3) Philco drafted the subcontract at a time when neither party was represented by counsel; and (4) Civil Code section "1717 says if a contract provides for attorney fees, it applies to the entire contract unless each party was represented in the negotiations and execution by counsel."[4]

---

[4] Civil Code section 1717, subdivision (a), states in relevant part, "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs. [¶] Where a contract provides for attorney's fees, as set forth above, that provision shall be construed as applying to the entire contract, unless each party was represented by counsel in the

Philco does not challenge the amount of fees awarded or any other factual findings made by the court. Instead, Philco asserts there was no legal basis for an award of attorney fees by the court regardless of the findings it made. "An appellate court reviews a determination of the legal basis for an award of attorney fees independently as a question of law." (*Leamon v. Krajkiewcz* (2003) 107 Cal.App.4th 424, 431.)

"A valid . . . contract must be enforced according to its terms." (*Kalai v. Gray* (2003) 109 Cal.App.4th 768, 777 (*Kalai*) [court erred by awarding attorney fees in court proceeding when "parties' agreement provided for an award of fees only in favor of the 'prevailing party to the arbitration'"];[5] see Civ. Code, §§ 1638 ["The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity"], 1639 ["When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible"].) Here, the terms of the subcontract are crystal clear: "The arbitrator shall have the authority to award reasonable attorneys fees." There is no uncertainty to construe against Philco, the party that drafted the subcontract. (See Civ. Code, § 1654.) The arbitrator, not the court, was authorized to award reasonable attorney fees after arbitration of the parties' dispute. By waiving their right to arbitrate the dispute, Ponce and Philco did not implicitly create positive authorization for an award of attorney fees by a court following trial.[6]

---

negotiation and execution of the contract, and the fact of that representation is specified in the contract."

[5] To be clear, *Kalai* pertained to a dismissal of an action based on the existence of an arbitration clause and explicitly did not address the facts presented in this case: "The question then would be whether the parties' agreement providing for fees only for a prevailing party to what was intended to be a mandatory arbitration, could be interpreted to cover a subsequently agreed to court litigation. Of course, we need not decide that question here." (*Kalai*, *supra*, 109 Cal.App.4th at p. 778.)

[6] Ponce's primary response to the clear language of the arbitration clause is that another section of the subcontract setting forth a statute of limitations should be read to change the meaning of the attorney fee authorization language because the separate

It is true that a prevailing party in an arbitration that is awarded its attorney fees by an arbitrator may also be entitled to its reasonable attorney fees in subsequent judicial proceedings related to the confirmation of the arbitral award. (*Ajida Technologies, Inc. v. Roos Instruments, Inc.* (2001) 87 Cal.App.4th 534, 552 (*Ajida*) ["a contract provision that permits the recovery of fees in arbitration is broad enough to include fees in related judicial proceedings"].) The agreement in *Ajida* stated that "'[e]ach party's costs of arbitration, attorneys' fees and costs of experts shall be borne in such proportion as the Arbitration Panel may determine.'" (*Id*. at p. 551.) The arbitral award provided "that the contractual attorneys' fees clause 'shall be applicable to any dispute arising under or related to this Final Award.'" (*Ibid*.) In compliance with the parties' contract and the final arbitral award, the *Ajida* court awarded additional attorney fees to the prevailing party on appeal following this arbitral award. (*Id*. at p. 552.) In contrast, Ponce did not obtain an arbitral award and concomitant award of attorney fees by the arbitrator. There is no contractual authorization or authorization by an arbitrator for the recovery of attorney fees in this case.

Civil Code section 1717, subdivision (a), does not provide for a different result. "Section 1717 was originally enacted to make one-sided attorney fee clauses reciprocal in order to prevent parties with stronger bargaining power from oppressing weaker parties by inserting into contracts one-sided clauses, which would allow the stronger parties to collect contract damages *and* attorney fees if they prevailed in litigation but pay only contract damages if they lost." (*Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.* (2012) 211 Cal.App.4th 230, 245-246.) Had the subcontract imposed

_____

clause references legal actions rather than arbitrations. To wit, "Legal Action. No action related to or as a result of the performance of the contract shall be started by either party against the other more than two years after the completion of the Project or cessation of work under this contract. This limitation applies to all actions of any character, whether at law or in equity, and whether sounding in contract, tort or otherwise. . . ." We reject Ponce's strained interpretive approach, which would require us to ignore the plain meaning of the attorney fee language.

one-sided provisions favoring Philco, Civil Code section 1717 may have been relevant to determining Ponce's entitlement to attorney fees. But Civil Code section 1717 does not require a court to ignore an evenhanded contractual condition that the dispute be resolved in arbitration where the arbitrator is empowered to award attorney fees. (Cf. *Frei v. Davey* (2004) 124 Cal.App.4th 1506, 1511-1520 [contract required parties to submit dispute to mediation as condition precedent to right to obtain attorney fees as prevailing party].) Clearly, the parties intended to arbitrate any disputes arising out of the subcontract at the time they entered into the subcontract. (Civ. Code, § 1636 ["A contract must be interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful"].) Had the parties arbitrated their dispute, the arbitrator could have awarded attorney fees to the prevailing party, regardless of which party prevailed or the specific grounds on which the victory was obtained.

Finally, the parties' respective pleadings (which request the award of attorney fees) do not create an independent basis for the recovery of attorney fees. "Merely praying for relief to which one is not entitled cannot ordinarily engender either reliance or detriment." (*Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC* (2008) 162 Cal.App.4th 858, 898 [rejecting view that estoppel provides basis for awarding attorney fees]; see also *Hasler v. Howard* (2005) 130 Cal.App.4th 1168, 1171 ["A prevailing party is not entitled to fees simply because the opposing party requested them"]; *M. Perez Co., Inc. v. Base Camp Condominiums Assn. No. One* (2003) 111 Cal.App.4th 456, 467-468 [distinguishing cases in which the underlying litigation pertains to "the validity of the contract or the attorney fee provision," in which cases the prevailing party can recover fees even if they are successful in disproving the validity of the contract]; *Leamon v. Krajkiewcz, supra,* 107 Cal.App.4th at p. 437; but see *International Billing Services, Inc. v. Emigh* (2000) 84 Cal.App.4th 1175, 1186-1192 [much criticized case holding that a party is judicially estopped from denying existence

19

of contractual attorney fee clause when that party requests payment of attorney fees in pleading].) Regardless of which party prevailed at trial, an award of attorney fees would have been inappropriate pursuant to the plain language of the subcontract. Thus, the court should not have awarded any attorney fees to Ponce.

## DISPOSITION

The judgment is modified to eliminate the award of attorney fees to Ponce. As modified, the judgment is affirmed. Ponce's request for judicial notice and motion to submit additional evidence on appeal are denied, as the settlement agreement between Philco and Certified that is proffered to this court in each of these submissions is irrelevant to the issues presented on appeal. In the interests of justice, the parties shall bear their own costs on appeal.

IKOLA, J.

WE CONCUR:

O'LEARY, P. J.

THOMPSON, J.