[No. E030818. Fourth Dist., Div. Two. Jan. 14, 2003.]

DEBORAH WILSON, Plaintiff and Respondent, v.
SHARLENE M. RITTO, Defendant and Appellant.

## COUNSEL

Colton & Roesser, Roland Colton; Law Offices of Roxanne Huddleston and Roxanne Huddleston for Defendant and Appellant.

Quincy B. Cornelius; Law Offices of E. Bruce Menzies and E. Bruce Menzies for Plaintiff and Respondent.

## OPINION

**GAUT, J.**—Defendant Sharlene M. Ritto, D.P.M. (defendant) appeals a $260,352 medical malpractice judgment entered against her. Defendant complains the trial court erred in denying her motion to include on the special verdict form Dr. Kevin Metros as a joint tortfeasor for purposes of apportioning liability for noneconomic damages.

Defendant argues evidence that Dr. Metros committed medical malpractice was not required in order to name him on the special verdict form as a joint tortfeasor. All that was required was evidence he caused or contributed to plaintiff's injury. Defendant further contends that, even if evidence that Dr. Metros committed malpractice was required, defendant satisfied that requirement.

We conclude defendant was required to provide evidence that Dr. Metros violated the standard of care within the medical community, and such evidence was not provided. The trial court thus did not err in denying defendant's motion to include Dr. Metros on the special verdict form as a joint tortfeasor. The judgment is affirmed.

### 1. *Facts and Procedural Background*

Plaintiff suffered from bunions on both her feet. In 1997, defendant, who is a podiatrist, successfully performed a bunionectomy on plaintiff's left foot. The instant action arises from defendant's subsequent treatment of plaintiff's right foot.

In July 1998, defendant performed a bunionectomy on plaintiff's right foot. Following the surgery, plaintiff experienced a great deal of pain and clicking in her right foot.

In September 1998, defendant performed a second surgery to correct the problem. Defendant removed the screw she had inserted in the big-toe bone (first metatarsal) to join the two parts of bone cut during the bunionectomy. Defendant replaced the screw with K-wires that were used to hold the portions of bone together.

The second surgery was unsuccessful. The wire moved and poked the adjacent toe. This caused plaintiff a great deal of pain and the incision site became infected. Defendant placed plaintiff on antibiotics for the infection. In February 1999, defendant performed a third surgery in an attempt to correct the condition. Defendant removed the K-wire, removed bone in the joint area, and inserted an artificial joint implant.

In March 1999, following the third surgery, plaintiff was hospitalized for suffering from osteomyelitis, an infection of the bone and soft tissue. Defendant called an infectious disease specialist to treat the infection and performed a fourth surgery to remove the joint implant. After the surgery, plaintiff's toe was deformed, nonfunctional, significantly shorter due to removal of approximately 50 percent of the bone, and protruded upwards

almost 90 degrees due to contraction of soft tissue. Plaintiff could not wear a shoe on her right foot.

After the fourth surgery, plaintiff consulted an attorney who referred her to Dr. Metros, an orthopedic surgeon. When plaintiff first visited Dr. Metros in July 1999, Dr. Metros concluded plaintiff no longer had an infection. In August 1999, Dr. Metros performed surgery on plaintiff's right foot in an attempt to reconstruct her toe. He performed a bone graft to lengthen plaintiff's toe. The surgery area did not heal and became infected.

Two weeks later, Dr. Metros performed a second surgery to close the skin over the wound, but shortly after the surgery, plaintiff developed a staph infection. Dr. Metros performed a third surgery, during which he removed most of the bone graft. Shortly following the surgery, plaintiff was hospitalized for osteomyelitis.

Plaintiff recovered from the osteomyelitis and, while Dr. Metros's efforts were not entirely successful, plaintiff's toe was improved by his treatment. Her toe was straighter and longer than when she first saw Dr. Metros. She regained some use of her toe and can wear shoes. However, her toe still remains shorter than normal, is retracted, and sticks up. As a consequence, she suffers from a loss of balance and her physical activities are limited.

Plaintiff filed a medical malpractice action against defendant. During the trial, Dr. Metros testified that defendant breached the standard of care by placing the osteotomy cut too far toward the end of the toe bone. This resulted in cutting off the blood flow to the end of the toe and the bone necrosed. The second surgery failed because the necrotic bone was too brittle to support the K-wires, and defendant failed to determine whether there was necrotic tissue.

According to Dr. Metros, defendant also mismanaged plaintiff's infection by failing to identify the specific type of infection and failing to immediately consult an infectious disease expert upon first suspecting plaintiff might have osteomyelitis In addition, defendant should not have performed the third surgery while plaintiff had an infection and should not have used the joint implant since it had a useful life of only five years, and plaintiff was only 43 years old. As to the fourth surgery, in which defendant removed the implant, defendant failed to insert a spacer to prevent the toe from contracting.

Plaintiff's infectious disease expert, Dr. Ted Gay, testified that defendant mismanaged plaintiff's infection. Defendant prescribed the wrong type of

antibiotics and over-prescribed antibiotics. This increased the risk that, if plaintiff contracted an infection, the strain of infection would be more resistant to antibiotics, which is in fact what happened.

Defendant's expert, Dr. Robert Parker, a podiatrist, performed an independent medical examination of plaintiff's right foot. Although Dr. Parker did not examine plaintiff until after completion of Dr. Metros's last surgery, he testified that, after defendant's last surgery, plaintiff's foot condition was salvageable. He criticized Dr. Metros for performing the bone graft surgery before inserting spacers (little plastic bag inserts) to stretch the tissue in the area where the joint had been removed.

Dr. Parker also stated that, assuming plaintiff had an infection during Dr. Metros's first surgery, Dr. Metros should not have performed the surgery. However, plaintiff and Dr. Metros testified that plaintiff no longer had any infection when Dr. Metros performed the first surgery.

After both sides rested, defendant moved to add Dr. Metros to the special verdict form as a joint tortfeasor. The trial court denied the motion on the ground defendant failed to establish Dr. Metros violated the medical standard of care. The jury received a special verdict form which permitted the jury to apportion liability only between plaintiff and defendant. The jury ultimately found defendant 100 percent liable for plaintiff's injuries. The jury awarded plaintiff $280,000 for noneconomic damages and $10,352 for economic damages. The court .reduced the noneconomic damages to $250,000, and entered judgment against defendant for $260,352.

## 2. *Discussion*

Defendant complains the trial court erred in denying her motion to add Dr. Metros to the special verdict form as an additional tortfeasor against whom the jury could assess a percentage of fault.

■ We review de novo the issue of whether proof of medical malpractice was required to add Metros to the special verdict form.[1] "Indeed, there is no such presumption in favor of upholding a special verdict. Rather, a special verdict's correctness must be analyzed as a matter of law. [Citation]"[2]

Defendant argues all that was required was evidence that Dr. Metros contributed to the plaintiff's injury. The parties agree this is an issue of first impression. In resolving this matter we begin with our high court's succinct summary of the evolution of apportioning liability among joint tortfeasors.

[1]*Mendoza v. Club Car, Inc.* (2000) 81 Cal.App.4th 287, 303 [96 Cal.Rptr.2d 605]; *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 285 [73 Cal.Rptr.2d 596].
[2]*Mendoza v. Club Car, Inc., supra,* 81 Cal.App.4th at page 303.

"California's system of 'comparative fault' seeks to distribute tort damages proportionately among all who caused the harm. However, even after judicial adoption of the comparative fault system, every culpable tort defendant, regardless of his or her degree of fault, remained 'jointly and severally' liable to pay any damages attributable to the fault of others who failed to contribute their proportionate share. This rule of joint and several liability applied not only to the injured person's 'economic' damages, such as medical costs and lost earnings, but to 'non-economic' damages like emotional distress, pain, and suffering.

"In 1986, the voters adopted Proposition 51, an initiative measure· designed to modify the doctrine of joint and several liability in tort cases. Among other things, Proposition 51 added section 1431.2 to the Civil Code.[] Section 1431.2 provides that in an action for wrongful death, personal injury, or property damage, each defendant's liability for the plaintiff's 'non-economic' damages shall be several only, not joint, and that each defendant shall be liable only for the percentage of 'non-economic' damages which corresponds to that defendant's proportionate share of fault."[3]

■ Civil Code section 1431.2 quite clearly provides that a defendant's liability for noneconomic damages is limited "to a proportion commensurate with that defendant's personal share of fault."[4]

In determining a defendant's share of fault, the court may consider other joint tortfeasors' degree of fault for the plaintiff's injuries and reduce the defendant's share accordingly. A defendant may attempt to reduce his or her share of liability for noneconomic damages by seeking to add nonparty joint tortfeasors. But unless there is substantial evidence that an individual is at fault, there can be no apportionment of damages to that individual.

■ We thus must consider what constitutes "fault" within the meaning of Civil Code section 1431.2. Defendant argues that, to establish fault as to nonparty tortfeasors, all that is required is a showing of contribution. Liability need not be established. We disagree.

Defendant relies on *Roslan v. Permea, Inc.*[5] and *Kitzig v. Nordquist.*[6] But these decisions are not dispositive here. In *Roslan,* which is not a medical

[3]*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 595-596 [7 Cal.Rptr.2d 238, 828 P.2d 140], footnote omitted.
[4]*American Motorcycle Assn. v. Superior Court* (1978) 20 Cal.3d 578, 603 [146 Cal.Rptr. 182, 578 P.2d 899].
[5]*Roslan v. Permea, Inc.* (1993) 17 Cal.App.4th 110 [21 Cal.Rptr.2d 66].
[6]*Kitzig v. Nordquist* (2000) 81 Cal.App.4th 1384 [97 Cal.Rptr.2d 762].

malpractice case, the court merely concluded the case must be remanded to allow the jury to consider the settling parties' proportionate share of comparative fault in determining the nonsettling defendant's fair share of noneconomic damages.[7] The *Roslan* court did not address the issue of what evidence must be provided in order to add a nonparty to a special verdict as a joint tortfeasor.

This was also not considered in *Kitzig*. In *Kitzig*, a dental malpractice case, the first dentist who treated the plaintiff was not sued. The plaintiff sued a subsequent dentist who allegedly made the plaintiff's condition worse. The court rejected the second dentist's request to allocate damages to the first dentist, reasoning that the first dentist played no part in creating the actual injuries caused by the second dentist, for which the plaintiff sought compensation.[8]

In *Kitzig*, the court explained it was not enough to show a doctor's acts were a cause of damages for purposes of apportioning liability for damages. "[T]his form of proximate cause is not necessarily equivalent to fault analysis under Proposition 51. Fault connotes some form of active participation in creating the injuries for which the plaintiff seeks to recover. There was no evidence that Dr. Tarr [first dentist] was *at fault* with respect to the noneconomic damages suffered *in connection with Dr. Nordquist's negligence*."[9]

*Kitzig* holds that in order to apportion liability for noneconomic damages there must be evidence of fault, not just causation. *Kitzig* does not address the issue here of what must a defendant prove to establish a nonparty doctor is at fault within the meaning of Civil Code section 1431.2. Defendant claims all that is required is that the doctor contributed to the plaintiff's injuries; evidence that the doctor violated the medical standard of care is not required. But the court in *Kitzig* stated that proof of causation alone is not sufficient. A defendant must show more than that the doctor's treatment of the plaintiff contributed to the plaintiff's injuries. To prove fault, the defendant must show that the doctor violated the medical standard of care.

"Fault" is defined in Webster's Dictionary[10] as "a blameworthy moral weakness less serious than a vice . . . a failure to do what is right . . . a failure to do something required by law or the doing of something forbidden

[7]*Roslan v. Permea, Inc., supra,* 17 Cal.App.4th at page 113.
[8]*Kitzig v. Nordquist, supra,* 81 Cal.App.4th at page 1401.
[9]*Kitzig v. Nordquist, supra,* 81 Cal.App.4th at page 1401.
[10]Webster's Third New International Dictionary (1993) page 829.

by law." Black's Law Dictionary states that, "Under general liability principles, 'fault' is a breach of a duty imposed by law or contract. . . . The term connotes an act to which blame, censure, impropriety, shortcoming or culpability attaches. . . ."[11] These definitions are consistent with construing "fault" here as requiring evidence Metros violated the medical standard of care.

Fault, although not the equivalent of liability, connotes wrongdoing or culpability. And wrongdoing or culpability in the context of medical treatment is measured by the standard of care within the medical community. "Mere error of judgment, in the absence of a want of reasonable care and skill in the application of his medical learning to the case presented, will not render a doctor responsible for untoward consequences in the treatment of his patient."[12]

Apportionment among doctors under Civil Code section 1431.2 requires evidence of medical malpractice, not only as to named defendants, but also as to nonparty doctors. The burden of proof in apportioning non-economic damages among joint tortfeasors should not be contingent upon whether a joint tortfeasor is a named defendant. The same burden of proving fault applies regardless of whether a joint tortfeasor is a defendant or nonparty.

Here, evidence merely showing that Metros's treatment affected plaintiff's condition was not sufficient to add Metros as a joint tortfeasor. Defendant was required to establish Metros was at fault, and fault is measured by the medical standard of care.

Defendant argues she should not carry the burden of proving a nondefendant has committed medical malpractice in order to include the nonparty doctor on the special verdict form. We disagree. A defendant bears the burden of proving affirmative defenses and indemnity cross-claims. Apportionment of noneconomic damages is a form of equitable indemnity in which a defendant may reduce his or her damages by establishing others are also at fault for the plaintiff's injuries. Placing the burden on defendant to prove fault as to nonparty tortfeasors is not unjustified or unduly onerous.

---

[11]Black's Law Dictionary (6th ed. 1990) page 608.
[12]*Huffman v. Lindquist* (1951) 37 Cal.2d 465, 475 [234 P.2d 34, 29 A.L.R.2d 485]; *Custodio v. Bauer* (1967) 251 Cal.App.2d 303, 311-312 [59 Cal.Rptr. 463, 27 A.L.R.3d 884]; *Barber v. Superior Court* (1983) 147 Cal.App.3d 1006, 1017 [195 Cal.Rptr. 484, 47 A.L.R.4th 1].

This shifting of the burden of proof is a reasonable extension of the policy underlying the shifting of the burden of proof in *Summers v. Tice*.[13] In *Summers*, our high court held that a plaintiff who could not identify which of two negligent hunters shot him, but was certain one of them was the culprit, could sue both hunters. The *Summers* court concluded that fairness dictated that the wronged party should not be deprived of his right to redress, but the wrongdoers should be left to work out between themselves any apportionment.[14]

This policy of shifting the burden of proof to the defendant applies equally in the instant case, and the burden of proof required to add a nonparty to a special verdict form as a joint tortfeasor should not differ or shift simply because a joint tortfeasor is not named as a defendant.

■ Applying the medical malpractice burden of proof, we conclude defendant failed to establish Dr. Metros was a joint tortfeasor. Defendant's expert, Dr. Parker, merely criticized Dr. Metros for not using spacers to stretch the tissue before proceeding with the bone implant. There was no testimony that the failure to insert the spacers was below the standard of care and it cannot be assumed as such. Placing spacers in the surgical area may have created the same risk of infection and related problems as implanting the bone graft without first inserting spacers. Dr. Parker expressed his differing view as to how to treat plaintiff but did not state that Dr. Metros's treatment was below the standard of care.

Dr. Parker also indicated Dr. Metros should not have performed his first surgery if plaintiff's foot was infected. But there was evidence that plaintiff's foot was not infected at the time.

There being insufficient evidence of fault on the part of Dr. Metros, the trial court appropriately denied defendant's motion to add Dr. Metros to the special verdict form as a joint tortfeasor.

### 3. *Disposition*

The judgment is affirmed. Plaintiff is awarded her costs on appeal.

McKinster, Acting P. J., and Richli, J., concurred.

---

[13]*Summers v. Tice* (1948) 33 Cal.2d 80, 85 [199 P.2d 1, 5 A.L.R.2d 91].

[14]*American Motorcycle Assn. v. Superior Court, supra,* 20 Cal.3d 578, 590, quoting *Summers v. Tice, supra,* 33 Cal.2d at page 88; *Expressions at Rancho Niguel Assn. v. Ahmanson Developments, Inc.* (2001) 86 Cal.App.4th 1135, 1139 [103 Cal.Rptr.2d 895].