Filed 9/14/21  Luft v. Chadmar Colfin Rolling Hills CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CAROL LUFT,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>CHADMAR COLFIN ROLLING HILLS, LLC et al.,<br><br>    Defendants and Respondents. | B304308<br><br>(Los Angeles County Super. Ct. No. BC695475) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Michele E. Flurer, Judge.  Reversed in part and remanded with directions.

McLachlan Law, Michael D. McLachlan and Jason R. Doucette for Plaintiff and Appellant.

Hanger, Steinberg, Shapiro & Ash, Marc S. Shapiro, and Joette M. Carini for Defendants and Respondents.

————————————————

During a torrential rain, Carol Luft (Luft) saw mud and water from a golf course construction project flowing into her kitchen. She went outside and soon after tripped on uneven pavement, breaking her hip. She sued the owner of her apartment building, Cypress-1992 (Apartment Building), and third-parties who owned or possessed the golf course, or who were involved in construction activities on the golf course. After Luft settled with various third parties, the case went to trial against Apartment Building on negligence theories.[1] In support of its comparative fault affirmative defense, Apartment Building attempted to meet its burden of proof[2] by, inter alia, calling an expert to testify. He speculated that one or more different entities involved with the golf course construction project did not properly implement and maintain an adequate storm water drainage and erosion control plan. He admitted he did not know who did what wrong. The jury determined that Apartment

---

[1]     Luft and Apartment Building were the only two parties who went to trial.

[2]     A "defendant bears the burden of proof on new matter and affirmative defenses. [Citation.]" (S*argent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal.App.4th 1658, 1667.) "Contributory negligence is an affirmative defense, and the burden of establishing such negligence [is] upon the defendant who assert[s] it." (*Vaca v. Southern Pacific Co.* (1928) 91 Cal.App. 470, 476; *Gyerman v. United States Lines Co.* (1972) 7 Cal.3d 488, 501 ["The burden of proving that the plaintiff was negligent and that such negligence was a proximate cause of [plaintiff's] accident is on the defendants"].)

Building was 60 percent responsible, four of many third-parties[3] connected to the golf course were collectively 30 percent responsible, and Luft was 10 percent responsible.

Luft now appeals and challenges the comparative fault determination regarding the four third-parties on a host of grounds, including insufficiency of the evidence.  She requests that we throw out the jury's finding of comparative fault regarding the four third-parties and modify the judgment, or remand the matter to the trial court with directions to modify the judgment, to apportion fault between her and Apartment Building.  (*Munoz v. City of Union City* (2007) 148 Cal.App.4th 173, 183 (*Munoz*) [if fault is improperly allocated to a party, one remedy is to reallocate 100 percent of fault proportionally among the remaining parties at fault].)  Because there was insufficient evidence that the four third-parties were at fault, we reverse the judgment in part and remand with directions to the trial court to apportion liability between Luft and Apartment Building pursuant to the formula in *Munoz*.  As between them, their ratio of fault is 1/7 attributable to Luft and 6/7 attributable to Apartment Building.[4]  When these fractions are turned into a

---

[3]      The four third-parties are Hazard Construction Company (Hazard), Sukut Construction, Inc. (Sukut), Chadmar Group, L.P. (Chadmar Group), and Rolling Hills Country Club.  On the special verdict form, they were referred to collectively as the "Construction Entities."  These parties, and two others, settled before trial.

[4]      These fractions come from the jury assigning 70 percent of 100 percent of the fault to Luft and Apartment Building (Luft's 10 percent of fault plus Apartment Building's 60 percent of fault).  Thus, when the division of a fault within that 70 percent is

percentage of 100 by dividing the numerators by the denominators, Luft is 14 percent at fault and Apartment Building is 86 percent at fault.

**FACTS**

**The Complaint**

Luft alleged that in early 2017, she lived downhill from Rolling Hills Country Club in an apartment building.

At the time, Hazard, Sukut, Chadmar Group, and Rolling Hills Country Club, among others,[5] (collectively Uphill Parties) were building a residential subdivision and expanding the Rolling Hills Country Club golf course (Project) on land owned by Chandler's Ranch Properties, LLC. There is a quarry on the land maintained by the Rolling Hills Country Club. As part of the Project, the Uphill Parties "engaged in grading, construction and development activities . . . which were negligently planned, designed, supervised, controlled, constructed and/or installed[.]" On January 22, 2017, a heavy rain caused water, mud and debris to overflow from the Project and flood Luft's apartment. In the heavy rain, she left her apartment to speak to Apartment

---

considered, it is apparent that Luft was allocated 10/70 of that fault and Apartment Building was allocated 60/70 of that fault. Those fractions reduce to 1/7 and 6/7.

[5]  The other named defendants were Chadmar/ColFin Rolling Hills, LLC, Chadmar RSM Partners, L.P., Chandler's Palos Verdes Sand & Gravel Corporation, and Chandler's Ranch Properties, LLC. While Chadmar/ColFin Rolling Hills, LLC and Chadmar RSM Partners, L.P. settled with Luft prior to trial, the parties do not inform us of the disposition regarding Chandler's Palos Verdes Sand & Gravel Corporation and Chandler's Ranch Properties, LLC. Presumably, they were dismissed at some point.

4

Building's manager.  While returning, she tripped on uneven pavement and suffered injuries, including a fractured hip.

She sued the Uphill Parties for negligence and Apartment Building for negligence and premises liability.

**Luft's Settlement with Certain Parties**

Luft settled with Hazard, Sukut Chadmar Group, Rolling Hills Country Club, Chadmar/ColFin Rolling Hills, LLC, and Chadmar RSM Partners, L.P. for $250,000.  Those defendants filed a motion seeking a determination that the settlement was reached in good faith.  The trial court granted the motion.

**Trial**

There is no dispute that Luft met her burden of proving that Apartment Building's negligence caused her damages.  The burden shifted to Apartment Building to prove the allegation in its affirmative defense of comparative fault that others, including Luft, shared fault.

<u>Evidence Bearing on Comparative Fault</u>

At trial, Luft testified that mud and water entered her kitchen on the ground floor of her apartment.  Luft's standard of care and liability expert, Brad Avrit (Avrit), testified that he was aware water and mud came down from the hillside and entered the apartment complex and Luft's unit.  Apartment Building read into the record Luft's responses to contention interrogatories in which she stated (1) the negligence of Hazard, Sukut, Chadmar Group, and Rolling Hills Country Club led to massive flooding from a manmade lake on Rolling Hills Country Club property during a rainstorm and caused mud to enter her apartment, and (2) Hazard, along with other construction entities involved with the Project, negligently failed to either secure the exterior wall of the quarry or warn her of the danger.  Finally, a civil engineer

5

named John V. Doyle (Doyle) was called by Apartment Building to offer an opinion regarding the comparative fault of the third-parties.

With respect to Doyle's testimony, the jury heard the following. In 1990, he and a partner founded a company that practices forensic engineering and evaluates civil engineering issues, drainage, soil, soil failures, landslide, and building settlement. He has been doing that work for 30 years. Apartment Building retained Doyle "to investigate the rainfall and drainage conditions leading to the mud that entered [Luft's] property." He reviewed Google imagery "showing the location of the property;" news video depicting the conditions of the area during the flood on January 22, 2017; "rainfall records for the time and for several years before the event;" the deposition of Luft; the deposition of Apartment Building's manager; the deposition of Jorge Rivera (Rivera), Hazard's superintendent; and the deposition of Donald Barnes, Sukut's superintendent. Also, Doyle personally inspected the drainage conditions on the Rolling Hills Country Club golf course.

He explained that to get a grading permit, the building and grading code require a party to have a storm water drainage and erosion control plan "to ensure that during the grading operation . . . storm water . . . does not flood the surrounding areas or cause a mudflow or damage on the property in question or on the neighboring properties."

Turning to the Project, Doyle noted that its purpose was to reconstruct the golf course and construct building pads for luxury homes. It was a massive grading project. At the time of the rainfall on January 22, 2017, the area was bare dirt. The contractors had been moving "hundreds of thousands of cubic

yards of soil around." The area encompassed 200 acres or more. Luft's unit was 60 to 80 feet from the boundary of the golf course.

Apartment Building's counsel asked Doyle to explain his opinion about what happened in this case. He said there "was a massive flood and a slope failure" caused by a "very intense rainfall" coupled "with inadequate storm water drainage and erosion control measures on the grading project." He opined that the mud that intruded into Luft's kitchen came from the Project.

Next, Apartment Building's counsel asked, "What should the golf course individuals have done to prevent mudflow coming on to [Luft's] unit?" In answer to the question, Doyle stated, "They were responsible for . . . implementing and maintaining an adequate storm water drainage and erosion control plan. And some elements of that were not done properly because mud indeed did flow from the grading project onto the surrounding area[.]"

Doyle opined that the conduct of the golf course individuals fell below the standard of care.

On cross-examination, Doyle stated he did not know who owned the different segments of the 200-plus acres. Also, he had not reviewed the records of Ginter & Associates, the geotechnical engineer. Nor had he seen a storm water drainage and erosion plan for the Project. Doyle could not identify the architect. When asked if he knew who was at fault, he stated, "Well, there are a limited number of characters who had responsibility for [the] Project. So[,] it was one or more of those individuals." Asked who he would put on that list, he said, "The property owners, the general contractor whom I understand was a company called [Hazard], the grading contractor was a company called [Sukut], the civil engineer for the project—I don't know who that was—

7

[and] the geotechnical engineer, Ginter & Associates. And perhaps some other subcontractors that . . . I don't know the names of. But those would be the main parties who would be responsible for the performance of the project during the rainstorm in terms of storm water drainage and erosion control." Doyle acknowledged that there was a second grading contractor doing "fill placements and other grading work[.]" He did not know that contractor's name.

Luft's counsel elicited from Doyle that he had no expertise in golf course design, and he could not recall ever working on a case involving the failure of a slope on a golf course. Doyle was not asked to investigate the individual fault of the parties responsible for the Project. He said, "I could have done it. It would have required . . . a more comprehensive study and investigation on my part. . . . I came in to this project relatively late." In addition, he stated, "I have not seen the grading plan for the Project, which actually would be more pertinent to my assessment . . . if I was asked to evaluate the individual negligence of whatever party was responsible for the failure that occurred[.]"

Doyle corrected himself and said the distance between Luft's unit and the golf course was maybe 100 feet. He did not measure it.

Luft's counsel asked if Doyle assessed whether Los Angeles County (County) might have been at fault for inadequate storm drainage. Doyle said, "I did not do any analysis." He was not aware of whether the heavy rain "caused a failure . . . on the Palos Verdes Peninsula above the golf course [that caused] large volumes of water to run onto the golf course[.]" Doyle went on to admit that he had not seen any evidence "that water entered onto

8

the golf course from the higher areas [and] contributed to the flooding" of Luft's unit.  But he could not rule out the possibility that water had come onto the golf course from a higher area.  Later in his testimony, he agreed he could not state the specific elements that were not done properly on the Project.  But, from reading the deposition transcripts, he knew "they were engaged in efforts to pump water from the project . . . to prepare . . . the grading site for future rains."

Doyle was asked about the predominant feature of the golf course in 2010.  He replied, "There was a large pit or gravel pit on this property. . . .  It has subsequently been partially filled in as part of the regrading . . . of the golf course."

On re-direct, Doyle was asked, "If a proper storm water drainage and erosion control plan had been implemented, would this . . . flood have occurred?"  He said, "[T]he storm water drainage and erosion control plan should have been . . . designed to handle the storm[.]"  If the design was proper, and if it was installed correctly, he opined that "we should not have had the overflow and the mudflow and the slope failure that occurred[.]"  He further opined, "It's either a design problem, a construction problem, or a design and construction problem."

On re-cross, Doyle agreed that drainage plans are not required to account for "a huge influx of water that comes from an uphill property or a failed storm drain system[.]"  He again admitted that he did not investigate whether either of those things happened.

Motion for Nonsuit

Luft moved for a nonsuit or directed verdict on Apartment Building's affirmative defense of comparative negligence, arguing

9

that Apartment Building failed to proffer substantial evidence of third-party negligence.

The trial court denied the motion.

**The Special Verdict**

The special verdict required the jury to determine whether Apartment Building damaged Luft through its negligence, and to determine those damages. As to the comparative fault of the parties and nonparties, the special verdict included these sets of questions and/or instructions.

"Question No. 6: Were [Hazard], the Chadmar Group, Rolling Hills Country Club, and [Sukut] ('Construction Entities') negligent? [¶] . . . [¶]

"Question No. 7: Was the negligence of [the] Construction Entities' a substantial factor in causing [Luft's] harm? [¶] . . . [¶]

"Question No. 8: If you found that more than one party was at fault in causing [Luft's] harm, you must assign the percentage of fault to each party responsible for the harm. If you found that a party was not at fault, assign that party zero percentage (0%). [¶]

"What percentage of responsibility for [Luft's] harm do you assign to the following? [¶] . . . [¶]

"[Apartment Building] . . . [¶]

"Luft . . . [¶]

"Construction Entities . . . "

The jury found Apartment Building was negligent and its negligence caused Luft harm. Her medical expenses were $104,298.79, her past noneconomic damages were $85,000, and her future noneconomic damages were $170,000. Turning to comparative fault, it found that Apartment Building was 60

10

percent at fault, the Construction Entities 30 percent at fault, and Luft 10 percent at fault.

**Judgment**

The judgment recounted the special verdict, then stated: "Prior to trial, six defendants settled with [Luft] for the sum of $250,000, including some of those listed by the Court on the verdict form as the 'Construction Entities.' As related to this prior settlement, an allocation of offset was applied to economic damages awarded by the jury in the amount of $72,500." The judgment required Apartment Building to pay Luft $21,368.91 in economic loss and $153,000 in noneconomic loss for a total of $174,368.91 in damages.

This appeal followed.

## DISCUSSION

## I.  Sufficiency of the Evidence Regarding Apartment Building's Comparative Fault Affirmative Defense.

This case involves burden shifting.  On Luft's negligence based causes of action, she had the burden of proof.  (*Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1205 [a plaintiff in a negligence suit generally has the burden of proof on all the elements].)  But with respect to the comparative fault affirmative defense, the burden shifted to Apartment Building, i.e., Apartment Building had the burden of proving that Hazard, Sukut, Chadmar Group, Rolling Hills Country Club and Luft shared fault for her injuries.  (*Wilson v. Ritto* (2003) 105 Cal.App.4th 361, 370 (*Ritto*).)  The benefit to Apartment Building from asserting this defense is explained, at least in part, by Civil Code section 1431.2, subdivision (a), which provides, "In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each

11

defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount." As noted in *Ritto*, a defendant can seek to prove that nonparty tortfeasors bear or share fault for damages. (*Ritto*, *supra*, 105 Cal.App.4th at p. 369.)

A jury's apportionment of fault must be upheld by a reviewing court if it is supported by substantial evidence. (*Rosh v. Cave Imaging Systems, Inc.* (1994) 26 Cal.App.4th 1225, 1233–1234 (*Rosh*).) Speculative possibilities are not substantial evidence. (*Griffin v. The Haunted Hotel, Inc.* (2015) 242 Cal.App.4th 490, 507.)

As Luft argues, Apartment Building failed to meet its burden of proof because Doyle's testimony was speculative and her interrogatory response—which Apartment Building tried to use against her—lacked evidentiary value.

We agree.

A.  Negligence Law.

"No suggestion of negligence arises from the mere happening of an accident. [Citations.]" (*Edwards v. California Sports, Inc.* (1988) 206 Cal.App.3d 1284, 1287.) A party must prove, inter alia, a breach of the duty of care. (*Ibid.*) Garden variety negligence is the failure to exercise the care a person of ordinary prudence would exercise under the circumstances. (*Delaney v. Baker* (1999) 20 Cal.4th 23, 30.) In contrast, professional negligence is the failure to exercise the knowledge, skill and care ordinarily possessed and employed by members of the profession in good standing. (*Ibid.*)

12

In addition to breach of the duty of care, a party must prove that the breach caused damages. (*McGarry v. Sax* (2008) 158 Cal.App.4th 983, 994.)

"A person who qualifies as an expert may give testimony in the form of an opinion if the subject matter of that opinion 'is sufficiently beyond common experience that the opinion of the expert would assist the trier of fact.' [Citations.]" (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1116.) An expert "does not possess a carte blanche to express any opinion within the area of expertise. [Citations.]" (*Id.* at p. 1117.) Speculative expert opinions based on assumptions of fact without evidentiary support have no evidentiary value. "Similarly, when an expert's opinion is . . . unaccompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion, that opinion has no evidentiary value because an 'expert opinion is worth no more than the reasons upon which it rests.' [Citation.]" (*Ibid.*)

An alternative way to prove breach of a duty of care is res ipsa loquitur, "an evidentiary rule for 'determining whether circumstantial evidence of negligence is sufficient.' [Citation.]" (*Howe v. Seven Forty Two Co., Inc.* (2010) 189 Cal.App.4th 1155, 1161.) "In order to invoke res ipsa loquitur, the [proponent] has the burden to establish three conditions: '(1) the event must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; [and] (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff.'" (*Ibid.*) The doctrine "has been applied where the defendant was responsible for construction, maintenance, or inspection of [a] defective premises

13

which caused the injury. [Citations.]" (*Di Mare v. Cresci* (1962) 58 Cal.2d 292, 299.)

   B. Analysis.[6]

      1. *Direct Evidence of Negligence.*

Doyle testified that the "golf course individuals" were responsible for implementing and maintaining an adequate storm water drainage and erosion control plan. He also testified that some unspecified elements were done improperly, and that it was either a design problem, a construction problem, or a design and construction problem. This is an opinion unaccompanied by a reasoned explanation connecting the factual predicates to the conclusion. Moreover, he never offered an opinion that Hazard, Sukut, Chadmar Group, or Rolling Hills Country Club were specifically at fault. Rather, he assigned fault to "one or more" of the property owners, Hazard, Sukut, an unspecified civil engineer, a geotechnical engineering company called Ginter & Associates, "perhaps some other subcontractors," and possibly the golf course architect. Based on the "one or more" qualification, Doyle suggested, for example, the possibility that the civil engineer or the geotechnical engineering company was solely at fault and Hazard, Sukut, Chadmar Group, or Rolling Hills Country Club were not at fault. Finally, Doyle could not rule out the possibility that the water came onto the golf course from another location, or the possibility that the County was at fault.

---

[6]    The parties debate whether this case should be analyzed under ordinary negligence principles or professional negligence principles. This debate is moot. Apartment Building's evidence was insufficient to show a breach of either an ordinary duty of care or a professional duty of care.

Now we turn to Luft's interrogatory responses. They could be used against her at trial "so far as admissible under the rules of evidence[.]" (Code Civ. Proc., § 2030.410.)

In one response, Luft baldly stated that Hazard, Sukut, Chadmar Group, and Rolling Hills Country Club were negligent. In a second response, she said Hazard and unspecified others negligently failed to either secure the exterior wall of the quarry or warn her of the danger. But she did not identify why the exterior wall of the quarry was not secure, what Hazard and others should have done in the exercise of due care to make it secure, and why the purported failure to secure the exterior wall was the cause of her damages.

It is inescapable that Luft's interrogatory responses were improper lay opinion because they were not rationally based on her perceptions and did not derive from her personal knowledge. (Evid. Code, §§ 800 [lay opinion is limited to one that is rationally based on the perception of the witness], 702, subd. (a) [in general, "the testimony of a witness concerning a particular matter is inadmissible unless [she] has personal knowledge of the matter"].) Though Luft did not object on either of these grounds,[7] we point out these rules of evidence because they underscore why her responses were speculative and therefore not substantial evidence that Hazard, Sukut, Chadmar Group, and Rolling Hills Country Club were negligent and caused Luft's damages.

---

[7]     Luft's counsel objected to the admission of the interrogatory responses on the theory that they contained contentions, not factual statements. Also, he argued that the interrogatory amounted to "litigation conduct" that could not be used against her.

15

Last, we examine the impact of the testimony given by Luft and Avrit. Luft testified that mud and water entered her kitchen on the ground floor of her apartment. Avrit testified that he was aware water and mud came down from the hillside and entered Luft's unit. This evidence did not purport to assign blame to the third-parties and did not support the jury's apportionment of fault.

2. *Circumstantial Evidence of Negligence.*

Doyle testified that "some elements [of the storm water drainage and erosion control plan] were not done properly because mud indeed did flow from the grading project onto the surrounding area[.]" In other words, he inferred negligence from what happened. Though Apartment Building does not acknowledge it, its theory of comparative fault at trial was, effectively, res ipsa loquitur. This runs into multiple problems. There is no suggestion by Apartment Building that it argued this theory, or that the jury was instructed on this theory. Further, Doyle did not testify that the event was of a kind which ordinarily does not occur in the absence of someone's negligence, and that the event was caused by an agency or instrumentality within the exclusive control of Hazard, Sukut, Chadmar Group, or Rolling Hills Country Club.

3. *Conclusion.*

Apartment Building's direct evidence of negligent conduct by the Construction Entities was speculative, and its circumstantial evidence of their negligent conduct did not satisfy the elements of res ipsa loquitur. There is but one conclusion: Apartment Building did not meet its burden of proof regarding the Construction Entities' alleged negligence and the jury's

16

apportionment of fault to them was not supported by substantial evidence and must be reversed.[8]

## II. Remedy.

"'Whenever an appellate court may make a final determination of the rights of the parties from the record on appeal, it may, in order to avoid subjecting the parties to any further delay or expense, modify the judgment and affirm it, rather than remand for a new determination.'" (*Munoz, supra*, 148 Cal.App.4th at p. 183.) Or, we can remand the matter with directions to the trial court. (*Id*. at p. 186.)

In this case, a new trial on comparative fault is not necessary. The main evidence of third-party fault came from Doyle, and the other evidence of third-party fault was inconsequential. By his own admission at trial, Doyle did a limited investigation and did not determine the fault of any individual person or party. Also, it is apparent that he relied on an inference of fault rather than on a fact-based opinion that any third-party breached a duty of care by doing, or failing to do, some specific thing related to the storm water drainage and erosion control plan. Further, Doyle did not prove res ipsa loquitur. Last, Apartment Building does not suggest that this case needs to go back for a new trial in the event fault must be reallocated.

---

[8] Luft additionally argues, among other things, that the special verdict was defective; the trial court should have precluded all evidence of third-party negligence; Doyle's testimony failed to establish the professional standard of care, lacked foundation and was beyond the scope of his expert designation; and her interrogatory responses were inadmissible. These issues are moot.

17

*Munoz* offers a formula for allocating fault between Luft and Apartment Building proportionally.[9] (*Munoz*, *supra*, 148 Cal.App.4th at pp. 183–186.)

The jury allocated 70 percent of the fault to Luft and Apartment Building:  10 percent to Luft and 60 percent to Apartment Building.  Because Apartment Building did not prove that Hazard, Sukut, Chadmar Group, and Rolling Hills Golf Course were negligent, that means 30 percent of the fault is unallocated.  *Munoz* teaches that this 30 percent of fault must now be allocated between Luft and Apartment Building because 100 percent of the fault must be allocated.

As between Luft and Apartment Building, Luft is 10/70 at fault and Apartment Building is 60/70 at fault, i.e., Luft is 1/7 at fault and Apartment Building is 6/7 at fault.  To allocate 100 percent of the fault between them instead of just 70 percent is a matter of determining the percentage of fault that they bear in relation to each other.  Turning these fractions into percentages is a matter of dividing 1 by 7 and 6 by 7:  1 divided by 7 is 0.1428

---

[9] *Munoz* identified the formula thusly:  "The Restatement Third of Torts suggests that when an appellate court determines the fact finder erred in assigning a percentage of fault to a party or other entity, '[o]ne remedy is for the court to reallocate the nonliable person's share of comparative responsibility proportionately to the remaining persons.'  [Citation.]  In one of the illustrations provided, in a suit by A against B and C, the fact finder assigns 30 percent responsibility to A, 60 percent responsibility to B, and 10 percent responsibility to C.  When the appellate court holds that the jury should not have been asked to assign a percentage of responsibility to C, '[t]he court may avoid a new trial by assigning 33-1/3 percent (30/90) responsibility to A and 66-2/3 percent (60/90) of the responsibility to B.'  [Citation.]" (*Munoz*, *supra*, 148 Cal.App.4th at pp. 183–184.)

(or 14.28 percent of 100), and 6 divided by 7 is 0.8571 (or 85.57 percent of 100).  Rounding to the nearest whole percentages brings us to 14 percent and 86 percent.

## DISPOSITION

The judgment is reversed in part and remanded to the trial court with directions to enter a new judgment apportioning liability 14 percent to Luft and 86 percent to Apartment Building. Luft shall recover her costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
ASHMANN-GERST


We concur:


_____, P. J.
LUI


_____, J.
HOFFSTADT


19