[No. B221531. Second Dist., Div. Three. May 18, 2012.]

KATERINA CHAKALIS, Plaintiff and Appellant, v.
ELEVATOR SOLUTIONS, INC., et al., Defendants and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts 2. and 3. of the Discussion.

1558

COUNSEL

Esner, Chang & Boyer, Stuart B. Esner, Andrew N. Chang and Holly N. Boyer for Plaintiff and Appellant.

Bonetati & Kincaid and Mark L. Kincaid for Defendant and Respondent Elevator Solutions, Inc.

Hanger, Steinberg, Shapiro & Ash, Paul V. Ash and Hillary D. Patton for Defendant and Respondent Fountain Springs HOA.

Grant, Genovese & Baratta, James M. Baratta and Lance D. Orloff for Defendants and Respondents Karim Merat and Ross Morgan and Company, Inc.

OPINION

KITCHING, J.—

## INTRODUCTION

When a defendant in a personal injury action contends that a nonparty physician's treatment of the plaintiff caused part or all of the plaintiff's injuries, can the trier of fact find the physician comparatively at fault without evidence that the physician's medical malpractice caused the plaintiff's injuries? We conclude the trier of fact cannot make such a finding. In order to

prevail on a defense of comparative negligence by a nonparty physician, the defendant must prove each of the elements of a claim for medical malpractice.

In this case, plaintiff Katerina Chakalis sustained personal injuries after the elevator in her apartment building malfunctioned and fell six floors. She filed a complaint for negligence and premises liability against four defendants: (1) Elevator Solutions, Inc. (ESI), the elevator maintenance company that serviced the malfunctioning elevator; (2) Fountain Springs Manor Home Owners Association (Fountain Springs HOA), which owned or controlled the apartment building; (3) Ross Morgan & Company (Ross Morgan), the property manager; and (4) Karim Merat, Ross Morgan's agent.

The case went to trial and the jury returned a mixed verdict. Although the jury awarded plaintiff damages, it found that ESI was not liable to plaintiff. The jury instead found that Fountain Springs HOA was 25 percent at fault; Ross Morgan and Karim Merat were 15 percent at fault; plaintiff was 8 percent at fault; and a nonparty, James Dahlgren, M.D., was 52 percent at fault. The trial court entered judgment in accordance with the special verdict.

On appeal plaintiff's main challenge to the judgment concerns the apportionment of fault to Dr. Dahlgren. This challenge has merit.

In *Wilson v. Ritto* (2003) 105 Cal.App.4th 361, 364 [129 Cal.Rptr.2d 336] (*Wilson*), the court held that a nonparty medical doctor cannot be found comparatively at fault in a personal injury action unless the defendant proves with expert testimony the doctor failed to meet the applicable standard of care. Applying the logic and reasoning of *Wilson*, we conclude that a nonparty medical doctor cannot be found comparatively at fault unless the defendant proves all of the elements of medical malpractice. We also conclude that a jury cannot find a nonparty medical doctor comparatively at fault for the plaintiff's injuries unless the jury is instructed on the requirements of a medical malpractice claim.

Here, defendants did not prove the elements of breach and causation against Dr. Dahlgren with expert testimony, nor did they request jury instructions regarding medical malpractice. We therefore reverse the judgment with respect to Fountain Springs HOA, Ross Morgan and Karim Merat because the special verdict finding that Dr. Dahlgren was 52 percent at fault was contrary to law and not supported by substantial evidence.[1]

---

[1] For reasons we shall explain, defendants' failure to prove Dr. Dahlgren did not meet the applicable standard of care was the result of invited error. The trial court nonetheless committed reversible error because defendants did not meet their burden with respect to the element of causation.

The jury's erroneous apportionment of fault to Dr. Dahlgren, however, is unrelated to its finding that ESI was not negligent or otherwise at fault for plaintiff's injuries. In the unpublished portion of the opinion, we conclude that there was substantial evidence to support this finding. Accordingly, we affirm the judgment with respect to ESI.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *The Accident*

Plaintiff rented an apartment in West Hollywood. Before the accident plaintiff and ESI warned Fountain Springs HOA, Ross Morgan and Karim Merat about potential safety problems with the elevator in plaintiff's building.

On July 1, 2005, plaintiff came home after an evening socializing with friends. About 2:20 a.m. she took the elevator up toward her penthouse apartment, which was six levels above the bottom floor. When the elevator reached the top level, it began shaking and going up and down. The elevator then suddenly dropped six floors, crashed into the bottom level, bounced up about six feet, and then bounced several more times before finally coming to a rest.

The elevator ceiling came completely dislodged and fell on top of plaintiff, causing a three-and-one-half-centimeter laceration on her head. According to plaintiff, hydraulic oil spilled into the elevator and soaked her.

Emergency paramedics arrived at the scene at 3:08 a.m. Plaintiff was taken to Cedars Sinai hospital, where she was admitted into the emergency room at 3:27 a.m.

### 2. *Plaintiff's Injuries*

#### a. *Emergency Room Treatment and Exams*

When plaintiff arrived in the emergency room she was initially treated by Dr. Sujal Mandavia. Plaintiff's chief complaints were that she had a headache and left shoulder pain. Dr. Mandavia found a laceration on plaintiff's head. He also conducted respiratory, heart, abdominal, neurologic and other exams, each of which indicated plaintiff was in normal condition, except that plaintiff had some tenderness on the left side of her back. Additionally, Dr. Mandavia ordered X-rays and a CT scan, both which came back negative.

Dr. Kenneth Corre examined plaintiff from "head to toe" about 6:30 a.m. on the day of the accident. Except for tenderness in plaintiff's back and her laceration, Dr. Corre did not find any injuries. After consulting with other medical professionals at the hospital, Dr. Corre determined that plaintiff should be discharged and did not need to be admitted to the hospital. Plaintiff and her family objected and urged that she remain at Cedars Sinai, but she was nevertheless discharged that day.

### b. *Dr. Corre's Second Exam*

On July 7, 2005, plaintiff went back to Cedars Sinai to have her stitches removed. Coincidently, Dr. Corre was on duty at the time and he was the physician who treated and examined her. Plaintiff complained about a number of ailments, including (1) a headache, (2) left shoulder pain, (3) low back pain, (4) feeling dysphoric, meaning she just did not feel right, and (5) hydraulic oil poisoning. In light of these complaints, Dr. Corre conducted another head-to-toe physical exam. Dr. Corre found that her laceration was healing well and that plaintiff was "absolutely healthy and minimally symptomatic."

Dr. Corre concluded that plaintiff had a concussion, neck and low back strain, and insomnia, and that her complaints were way out of proportion to his findings. According to Dr. Corre, plaintiff expressed each one of her concerns "as though it were severe and as if it were life-threatening." With respect to plaintiff's claim she was drenched with hydraulic oil on the day of the accident, Dr. Corre opined this claim was "impossible" because none of the physicians, nurses or paramedics who treated and examined plaintiff on the day of the accident made any note of smelling or seeing abnormal fluid on her body, breath, or clothing.

### c. *Dr. Dahlgren's Diagnosis and Treatment*

On July 21, 2005, plaintiff was examined by Dr. James Dahlgren. Although Dr. Dahlgren is not a board certified toxicologist, one of his fields of practice is toxicology and he has written papers on toxicology issues. Before seeing plaintiff, Dr. Dahlgren had not previously treated a patient with alleged hydraulic oil poisoning.

Dr. Dahlgren diagnosed plaintiff with hydraulic oil poisoning and placed plaintiff on a detoxification treatment plan. This plan consisted of (1) taking saunas 10 to 12 times a day, which was meant to help plaintiff sweat out toxic metals found in the hydraulic oil; (2) taking glutathione, which Dr. Dahlgren contended helps metabolize chemicals, including hydrocarbons found in hydraulic oil; (3) taking vitamin and mineral supplements; (4) and chelation, which is a method of removing heavy metals from the body by ingesting an agent that attaches to the metals.

To confirm his diagnosis, Dr. Dahlgren sent plaintiff's urine samples to a laboratory for testing. According to Dr. Dahlgren, the tests indicated that plaintiff had elevated arsenic and mercury levels in her body. Dr. Dahlgren conceded, however, that plaintiff could have had high levels of mercury in her body before the accident because she consumed large quantities of seafood.

After Dr. Dahlgren placed plaintiff on his detoxification treatment plan, plaintiff brought to him a sample of the hydraulic oil she claimed spilled on her during the accident. Dr. Dahlgren sent the sample to Del Ray Analytic (DRA) to determine whether there was mercury or arsenic in the hydraulic oil. The tests, however, did not detect either substance. Nonetheless, Dr. Dahlgren did not change his diagnosis because he believed DRA's tests had very high detection levels. Unless there was mercury or arsenic in amounts greater than two parts per million, these substances would not be detected. In Dr. Dahlgren's view, arsenic and mercury could still have been in the hydraulic oil in an amount that was toxic.

While plaintiff was undergoing her detoxification treatment, including chelation therapy, Dr. Dahlgren obtained a copy of the material safety data sheet (MSDS) for the hydraulic oil plaintiff claimed caused her poisoning. The MSDS is a document created by the hydraulic oil's manufacturer. It indicated that prolonged exposure to the hydraulic oil could cause skin irritation but did not warn of any other significant health concerns. Indeed, the MSDS specifically stated that the hydraulic oil was not expected to be harmful if swallowed and was not expected to be harmful to internal organs if it was absorbed through the skin. Dr. Dahlgren did not talk to plaintiff about the MSDS, nor did he change his diagnosis in light of the statements made in the document.

Plaintiff advised Dr. Dahlgren about a number of health problems in addition to alleged hydraulic oil poisoning. Dr. Dahlgren, however, did not treat her for other health problems, except that he prescribed Vicodin a number of times in order to alleviate her pain.

### d. *Plaintiff's Treatment by Other Health Care Professionals*

After plaintiff was discharged from Cedars Sinai hospital she was examined and treated by numerous health care professionals for a wide variety of physical and psychological ailments she contends resulted from the accident. One of the most significant of these ailments was the development of Stevens-Johnson syndrome, which causes a severe rash on the skin. The parties vigorously dispute the nature and extent of plaintiff's injuries and the causal link, if any, to defendants' alleged negligence and Dr. Dahlgren's treatment.

According to plaintiff's psychologist, Dr. Craig Snyder, plaintiff suffered from depression and posttraumatic stress disorder as a result of the accident. In Dr. Snyder's view, plaintiff's physical problems, especially the onset of Stevens-Johnson syndrome, had a tremendous negative effect on plaintiff's psychological well-being. Plaintiff also reported to Dr. Snyder that she feared Dr. Dahlgren's chelation therapy because the treatment was painful, fatiguing, and caused her anxiety.

Because plaintiff was prescribed pain relief medication from a number of physicians, Dr. Snyder referred plaintiff to Dr. Lawrence Miller, who served as plaintiff's pain management physician. Dr. Miller prescribed Vicodin for plaintiff. In May 2006, in light of the increased pain plaintiff was suffering from Stevens-Johnson syndrome, Dr. Miller increased plaintiff's dosage to 8 to 10 tablets of Vicodin a day.

### e. *Plaintiff's Alleged Suicidal Condition*

In October 2006, plaintiff was taken by an ambulance to the Cedars Sinai psychiatric ward, where she stayed for two days. Plaintiff's friends had arranged for plaintiff to be taken to the psychiatric ward because they were concerned she was attempting to kill herself. Plaintiff stated to her friends, "I can't deal anymore" and "I wish I was dead." When she was asked at her deposition[2] whether she was attempting to commit suicide, plaintiff responded, "Not to my memory."

### f. *Plaintiff's Liver Failure*

On November 14, 2006, plaintiff was taken to the hospital at the University of California at Los Angeles (UCLA) for acute liver failure. She received a liver transplant on November 17, 2006. A biopsy of her liver indicated plaintiff's liver failure was caused by acetaminophen toxicity. According to the pathologist who examined the biopsy at UCLA hospital, the liver failure was not the result of a chronic long-term illness, but rather the result of rapid liver failure which occurred within a week.

It is undisputed that plaintiff was taking Vicodin in the weeks and days before her liver failure. Expert medical testimony established that regular strength Vicodin contains 500 milligrams of acetaminophen and extra strength Vicodin contains 750 milligrams. When plaintiff was admitted to UCLA hospital, she had 35,000 milligrams of acetaminophen in her system.

---

[2] At trial the court determined that plaintiff did not have the ability to testify. Pursuant to a stipulation of the parties and an order of the court, excerpts of plaintiff's deposition transcript were read at trial.

In May 2007, plaintiff's body rejected her liver. Plaintiff was readmitted to UCLA hospital for treatment. Fortunately, the physicians there were able to stabilize plaintiff's condition, and she was discharged without another liver transplant.

According to Dr. Snyder, plaintiff's psychological condition substantially worsened after her liver transplant and her body's rejection of her liver.

### 3. The Pleadings

On October 5, 2005, plaintiff filed a complaint for premises liability and negligence.[3] Defendants filed answers to the complaint generally denying plaintiff's allegations. They also asserted numerous affirmative defenses, including comparative fault and intervening, superseding acts.

### 4. The Trial

#### a. The Cause and Extent of Plaintiff's Injuries

The cause and extent of plaintiff's injuries were vigorously disputed at trial. There was conflicting evidence on these issues. The principal witnesses defendants called were emergency room doctor Kenneth Corre, M.D., whose testimony we summarized *ante*, and defendants' experts Dr. Richard Clark and Dr. Martin Levine.

Dr. Clark was highly critical of Dr. Dahlgren's diagnosis and treatment of plaintiff. He opined that the tests conducted by Dr. Dahlgren showed no or insignificant amounts of mercury and arsenic in plaintiff's system and that the probability that plaintiff was exposed to mercury and arsenic as a result of the accident was very low. He further opined that Dr. Dahlgren's entire detoxification program, especially the chelation therapy, was unnecessary. Dr. Clark is board certified in medical toxicology and emergency medicine.

Dr. Clark also criticized Dr. Dahlgren's prescription of Provigil, which he stated "is pretty well known to have some bad rashes associated with it, possibly even Stevens-Johnson syndrome."

At the end of Dr. Clark's testimony, one of defendants' attorneys asked the following question: "In your review of the medical records in this case, and Dr. Dahlgren's records . . . and his course of therapy with Ms. Chakalis, have

---

[3] Plaintiff also asserted a cause of action for products liability, which she did not pursue at trial.

you come to an opinion regarding whether or not he met the standard of care for a treating toxicologist with respect to his treatment of her?"

Plaintiff's attorney objected to this question as "[o]utside the scope." He then requested a sidebar conference, which was granted. In this conference, the trial court asked: "Why is it relevant, anyway? Let's assume [Dahlgren is] responsible for the mal—because of malpractice, she has her injury. Why is that relevant to her injury?" After further discussion, the objection was sustained.

Dr. Martin Levine, a board certified neurologist and a psychiatrist, was also a key witness for defendants. He had examined plaintiff in September 2006, two months before her liver failure.

Dr. Levine testified that at the examination, plaintiff stated she was suffering from the following ailments: (1) tingling and numbness in the hands and feet; (2) burning of the skin across her waist; (3) toenail pain on the left foot on her big toe; (4) confusion—she could not determine whether an event was a dream or if it really happened to her; (5) headaches; (6) trouble concentrating; (7) loss of balance and vertigo; (8) pain down both legs; (9) trouble breathing; (10) anxiety; (11) blurred vision; (12) neck pain and hip pain at night; and (13) rashes and Stevens-Johnson syndrome. Dr. Levine opined that most, if not all, of plaintiff's complaints had a very strong psychiatric basis to them, and that the nature and extent of her complaints exceeded reasonableness.

Dr. Levine also opined that "there was not one heavy metal test that was positive at a level that would be expected to cause disease in a human being." He further stated there was no evidence of neurological disease that could be attributed to the accident.

### b. Jury Question to the Court

During deliberations the jury asked the trial court the following question regarding the special verdict form: "Pertaining to Question #16 on the Verdict Form, there are 3 blank spots—can we assign a percentage of responsibility to a person/entity not listed as a defendant in this case?" The court responded, "Yes."

### c. Special Verdict

On June 18, 2009, the jury returned the verdict. The jury found that defendants Fountain Springs HOA, Ross Morgan and Karim Merat and plaintiff Katerina Chakalis were negligent, that the negligence of each of these

parties was a substantial factor in causing plaintiff's injuries, and that plaintiff sustained damages. It also found, however, that ESI was not negligent.

The jury awarded the following damages: $143,689 in past medical expenses, $600,000 in past noneconomic loss, and $50,000 in future noneconomic loss. The jury apportioned fault as follows:

| PARTY | PERCENTAGE AT FAULT |
|---|---|
| ESI | 0 Percent |
| Fountain Springs HOA | 25 percent |
| Ross Morgan and Karim Merat | 15 percent |
| Katerina Chakalis | 8 percent |
| James Dahlgren, M.D. | 52 percent |

Dr. Dahlgren's name was handwritten by the jury and added to the list of defendants who were potentially at fault for plaintiff's injuries.

### 5. *Posttrial Proceedings*

After the trial the court entered a judgment pursuant to the special verdict. Subsequently, plaintiff filed a timely motion for a new trial, which the trial court denied. Plaintiff filed a timely notice of appeal of the judgment.[4]

## DISCUSSION

### 1. *The Jury's Finding That Dr. Dahlgren Was 52 Percent at Fault Was Contrary to the Law and Not Supported by Substantial Evidence*

■ "California's system of 'comparative fault' seeks to distribute tort damages proportionally among all who caused the harm. However, even after judicial adoption of the comparative fault system, every culpable tort defendant, regardless of his or her degree of fault, remained 'jointly and severally' liable to pay any damages attributable to the fault of others who failed to contribute their proportionate share. This rule of joint and several liability applied not only to the injured person's 'economic' damages, such as medical costs and lost earnings, but to 'non-economic' damages like emotional distress, pain, and suffering." (*DaFonte v. Up-Right, Inc.* (1992) 2 Cal.4th 593, 595 [7 Cal. Rptr.2d 238, 828 P.2d 140].)

---

[4] In this appeal plaintiff argues the trial court erroneously denied her motion for a new trial. An order denying a motion for a new trial is not directly appealable, but is reviewable on appeal from the underlying judgment. (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 19–20 [23 Cal.Rptr.3d 490, 104 P.3d 844].)

■   Proposition 51, adopted in 1986, created an exception to the general rule of joint and several liability. The exception is set forth in Civil Code section 1431.2, subdivision (a), which provides: "In any action for personal injury, property damage, or wrongful death, based upon principles of comparative fault, the liability of each defendant for non-economic damages shall be several only and shall not be joint. Each defendant shall be liable only for the amount of non-economic damages allocated to that defendant in direct proportion to that defendant's percentage of fault, and a separate judgment shall be rendered against that defendant for that amount." Proposition 51 also preserved the general presumption that joint tortfeasors are jointly liable. (Civ. Code, § 1431; *Henry v. Superior Court* (2008) 160 Cal.App.4th 440, 453 [72 Cal.Rptr.3d 808] (*Henry*).)

In *Wilson*, the court applied Civil Code section 1431.2 in circumstances very similar to this case. There, the defendant performed three surgeries on the plaintiff. Subsequently, the plaintiff received medical treatment from Dr. Metros. The plaintiff sued the defendant for medical malpractice, but did not sue Dr. Metros. At trial, the defendant's expert criticized Dr. Metros's treatment of the plaintiff but did not opine that Dr. Metros violated the medical standard of care. (*Wilson, supra*, 105 Cal.App.4th at pp. 366, 370.) After both sides rested, the defendant moved to add Dr. Metros to the special verdict form as a joint tortfeasor. (*Id.* at p. 366.) The trial court, however, denied the motion on the ground that there was insufficient evidence that Dr. Metros violated the medical standard of care. (*Ibid.*)

■   The Court of Appeal upheld the trial court's ruling denying the plaintiff's motion to add Dr. Metros to the special verdict form. In so doing, the court considered what constitutes "fault" within the meaning of Civil Code section 1431.2. (*Wilson, supra*, 105 Cal.App.4th at p. 367.) The court concluded: "Fault, although not the equivalent of liability, connotes wrongdoing or culpability. And wrongdoing or culpability in the context of medical treatment is measured by the standard of care within the medical community. 'Mere error of judgment, in the absence of a want of reasonable care and skill in the application of his medical learning to the case presented, will not render a doctor responsible for untoward consequences in the treatment of his patient.' [Fn. omitted.]

"Apportionment among doctors under Civil Code section 1431.2 requires evidence of medical malpractice, not only as to named defendants, but also as to nonparty doctors. The burden of proof in apportioning noneconomic damages among joint tortfeasors should not be contingent upon whether a

joint tortfeasor is a named defendant. The same burden of proving fault applies regardless of whether a joint tortfeasor is a defendant or nonparty." (*Wilson, supra*, 105 Cal.App.4th at p. 369.)

■ Defendants attempt to distinguish *Wilson* on the ground that it was a medical malpractice case, in contrast to this case where plaintiff did not assert a medical malpractice cause of action. For purposes of applying Civil Code section 1431.2, however, it makes no difference that the nature of defendants' alleged negligence was different from that of Dr. Dahlgren's. (*Henry, supra*, 160 Cal.App.4th at p. 461 [nonparty emergency room doctors could be comparatively at fault for purposes of Civ. Code, § 1431.2 in a premises liability case].)

    a.   *Plaintiff Is Estopped from Arguing That Defendants Failed to Prove Dr. Dahlgren Breached the Standard of Care*

Under *Wilson*, the burden of apportioning fault to Dr. Dahlgren fell squarely on defendants. Defendants were required to prove that Dr. Dahlgren breached the medical standard of care. Further, the element of breach in a medical malpractice claim can generally only be proven with expert testimony. (*Landeros v. Flood* (1976) 17 Cal.3d 399, 410 [131 Cal.Rptr. 69, 551 P.2d 389].) It is undisputed that there was no expert testimony that Dr. Dahlgren's treatment of plaintiff fell below the standard of care. Plaintiff thus contends there was insufficient evidence to find Dr. Dahlgren at fault. We reject this argument, however, because plaintiff is estopped from pursuing it on appeal.

"Under the doctrine of invited error, a party may not object to the sufficiency of the evidence to support a finding against him when the lack is the result of improper exclusion of evidence at his own instance. [Citations.] A party who has prevented proof of a fact by his erroneous objection will not be permitted to take advantage of his own wrong, and a reviewing court will assume that the fact was duly proved." (*Watenpaugh v. State Teachers' Retirement* (1959) 51 Cal.2d 675, 680 [336 P.2d 165]; accord, *Brewer v. Department of Motor Vehicles* (1979) 93 Cal.App.3d 358, 367 [155 Cal.Rptr. 643].) The doctrine of invited error is based on the principle of estoppel. (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403 [87 Cal.Rptr.2d 453, 981 P.2d 79].)

Here, plaintiff prevented defendants from proving that Dr. Dahlgren failed to meet the standard of care by objecting to a question posed to defendants'

expert witness regarding that issue.[5] This objection was not well taken. Contrary to the trial court's ruling, whether Dr. Dahlgren failed to meet the applicable standard of care was relevant to the issue of apportioning fault for plaintiff's injuries to Dr. Dahlgren. (See *Wilson, supra*, 105 Cal.App.4th at p. 364.) Plaintiff therefore is estopped from arguing on appeal that defendants failed to prove Dr. Dahlgren did not meet the standard of care.

Plaintiff argues that just because the question posed by defendants was objected to by plaintiff, and sustained by the court, defendants were in no way precluded from presenting evidence that Dr. Dahlgren's conduct fell below the applicable medical standard of care. This argument is primarily based on a statement made by Fountain Springs HOA's attorney, Paul Ash. After the trial court sustained plaintiff's objection, Mr. Ash stated that he would rephrase the question. But Mr. Ash never rephrased the question. Plaintiff thus contends defendants could have, but did not, prove that Dr. Dahlgren failed to meet the standard of care. We disagree.

After Mr. Ash stated he would rephrase his question, plaintiff's counsel continued to argue about the matter but the trial court cut this argument short by stating, "I sustained the objection, Counsel." Thus Mr. Ash's decision to not rephrase the question was reasonable in light of the trial court's indication that the issue was resolved. Moreover, the trial court did not sustain plaintiff's objection on the ground that the question was improperly phrased. Rather, it sustained the objection on the basis of relevancy. There is nothing in the record indicating the trial court would have changed its ruling had Mr. Ash rephrased his question. Plaintiff therefore cannot escape the doctrine of invited error.

> b. *There Was No Substantial Evidence Showing Dr. Dahlgren's Negligence Was a Substantial Factor in Causing Plaintiff's Injuries*

█ "The elements of a cause of action for medical malpractice are: (1) a duty to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) a breach of the duty; (3) a proximate causal connection between the negligent conduct and the injury; and (4) resulting loss or damage." (*Johnson v. Superior Court* (2006) 143 Cal.App.4th 297, 305 [49 Cal.Rptr.3d 52].)

---

[5] Plaintiff objected on the grounds that the question was "[o]utside the scope." The parties dispute the nature of this objection. Plaintiff contends she was arguing the question related to a matter outside of Dr. Clarke's expert designation. The record, however, does not support this contention. Moreover, the discussion among the court and counsel for both sides regarding the objection was about relevancy, and the court sustained the objection on relevancy grounds.

*Wilson* focused on the element of breach. It did not specifically address the other elements, including causation. In our view, the logic and reasoning of *Wilson* should be applied to the other elements. If, for example, a doctor's medical malpractice did not proximately cause any harm to the plaintiff, the trier of fact cannot apportion fault to that doctor pursuant to Civil Code section 1431.2.

■ " 'The law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony.' " (*Miranda v. Bomel Construction Co., Inc.* (2010) 187 Cal.App.4th 1326, 1336 [115 Cal.Rptr.3d 538]; accord, *Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1118 [8 Cal.Rptr.3d 363] [same]; *Salasguevara v. Wyeth Laboratories, Inc.* (1990) 222 Cal.App.3d 379, 385 [271 Cal.Rptr. 780] ["medical causation can only be determined by expert medical testimony"].) Defendants did not satisfy this requirement.

Defendants contend that much of plaintiff's physical pain and mental suffering were caused by Dr. Dahlgren's alleged medical malpractice. There was evidence that the chelation therapy prescribed by Dr. Dahlgren was unnecessary and painful, and that plaintiff feared the therapy. There was also evidence that plaintiff's belief she had hydraulic oil poisoning was confirmed by Dr. Dahlgren's diagnosis; that this diagnosis was incorrect; and that many of plaintiff's health problems had a very strong psychiatric basis to them.

Moreover, defendants argue, plaintiff's suffering as a result of Dr. Dahlgren's alleged medical malpractice can be tied to her liver failure. Plaintiff's liver failure was caused by an overdose of acetaminophen just weeks after plaintiff was admitted to a psychiatric ward to be monitored for risk of suicide. In defendants' view, the deterioration of plaintiff's mental state can be traced to Dr. Dahlgren's alleged misdiagnosis. Defendants also contend that Dr. Dahlgren's prescription of the medication Provigil caused the onset of Stevens-Johnson syndrome in plaintiff, which was the source of much of plaintiff's physical and mental pain and suffering.[6]

The fatal flaw with defendants' argument is that there was no expert testimony regarding the element of causation. While defendants' experts were critical of Dr. Dahlgren's treatment and discussed the dangers and risks associated with it, they did not actually offer an expert opinion that it was a substantial factor in causing plaintiff's injuries within a reasonable medical probability. Defendants therefore failed to meet their burden of showing

---

[6] As we stated *ante*, Dr. Clark testified the Provigil "possibly" caused Stevens-Johnson syndrome.

Dr. Dahlgren was comparatively at fault for plaintiff's damages for purposes of Civil Code section 1431.2.

### c. *A New Trial Is Required*

■ A motion for a new trial should be granted if there is an insufficiency in the evidence to justify the verdict, or the verdict is against the law, and this error materially affects the substantial rights of the moving party. (Code Civ. Proc., § 657.) ■ Here, the verdict was not supported by substantial evidence and was against the law because the jury found Dr. Dahlgren 52 percent at fault without expert testimony establishing that Dr. Dahlgren's alleged medical malpractice was a substantial factor in causing plaintiff's injuries. Further, this error materially affected plaintiff's rights because it reduced the amount of plaintiff's recovery. The trial court thus erroneously denied plaintiff's motion for a new trial.

### d. *On Remand the Jury Should Be Instructed Regarding Medical Malpractice*

■ It is the trial court's duty to see that the jury is instructed about the applicable law regarding the major subjects raised by the evidence, including affirmative defenses. (See *Paverud v. Niagara Machine & Tool Works* (1987) 189 Cal.App.3d 858, 863 [234 Cal.Rptr. 585], disapproved on other grounds in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574 [34 Cal.Rptr.2d 607, 882 P.2d 298]; *Lysick v. Walcom* (1968) 258 Cal.App.2d 136, 157–158 [65 Cal.Rptr. 406]; 7 Witkin, Cal. Procedure (5th ed. 2008) Trial, § 261, p. 315.) In this case, the parties did not request instructions regarding the requirements of proving medical malpractice and the trial court did not give any. The jury thus was not informed about important controlling legal principles relating to Dr. Dahlgren's fault, if any, for plaintiff's injuries. For example, the jury was not informed that in order to find Dr. Dahlgren comparatively at fault it was required to find he did not meet the applicable standard of care, and that this finding must be based on expert testimony. (See CACI Nos. 501, 502.) On remand, if defendants contend Dr. Dahlgren is comparatively at fault in a jury trial, the jury must be instructed on the requirements for proving a medical malpractice claim against him.

2., 3.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 1557.

## DISPOSITION

The judgment is affirmed with respect to ESI. The judgment is reversed with respect to Fountain Springs HOA, Ross Morgan and Karim Merat and the case is remanded for a new trial. In the interests of justice, each party shall bear their own costs on appeal.

Klein, P. J., and Croskey, J., concurred.

A petition for a rehearing was denied June 6, 2012, and appellant's petition for review by the Supreme Court was denied August 29, 2012, S203632. Werdegar, J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.