Filed 9/19/22  Krantz v. Kim CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

|  |  |
|---|---|
| STEVEN M. KRANTZ, | B313607 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. 19STCV15642) |
| JOO HYUNG KIM, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Thomas D. Long, Judge.  Affirmed.

Lara Ruth Shapiro for Plaintiff and Appellant.

Ford, Walker, Haggerty & Behar, James D. Savage, Jennie L. Hertzog, and Ashley S. Loeb for Defendant and Respondent.

_____

Plaintiff Steven M. Krantz sued defendant Dr. Joo Hyung Kim, a prosthodontist, for negligence arising from preparation and treatment of six of Krantz's teeth. Dr. Kim moved for summary judgment.[1] The trial court granted summary judgment, finding that Krantz's expert failed to opine or offer any explanation as to how any breach of the duty of care by Dr. Kim caused Krantz's injuries to a medical probability. We agree and affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

## I. Dr. Kim's Treatment of Krantz's Teeth

At issue in this case are six of Krantz's teeth that Dr. Kim placed crowns or veneers on, specifically teeth numbers 8, 9, 14, 18, 30, 31, between March 2017 and January 2019.

In October 2015, nearly two years before Krantz first visited Dr. Kim, Krantz visited Dr. Beigi at Pacific Dental Care. Dr. Beigi recommended root canals with posts and crowns on teeth numbers 14 and 18, noting that tooth number 18 might need extraction. He also recommended root canals for teeth numbers 30 and 31, or in the alternative, extraction of those teeth and implants. In his notes, Dr. Beigi observed that Krantz grinds his teeth, and had a lot of tarter, bone loss, and "bad" and "infected" gums. Krantz did not get any of the recommended treatment at Pacific Dental Care.

Dr. Kim treated Krantz at Del Dental Group in Playa Del Ray, California. At Krantz's first visit in March 2017, Dr. Kim performed a consultation and took X-rays of Krantz's teeth. Dr. Kim's notes from that day reflect that Krantz was missing a tooth and had several chipped teeth. Dr. Kim presented Krantz

---

[1] The parties have not provided us any information about the status of Krantz's claims against the codefendants.

with two treatment options for restorations of teeth numbers 14, 18, 30, and 31. Krantz returned to Dr. Kim in September 2017, at which time he underwent "scaling" and "root planning." Dr. Kim also proposed two additional treatment plans for teeth numbers 14, 18, 30, and 31. On September 20, 2017, Krantz signed a document titled "treatment plan" for teeth numbers 14, 18, 30, 31. Krantz than returned to Dr. Kim's office for work on those teeth, and eventually for veneers and then crowns on his two upper front teeth (teeth numbers 8 and 9), on numerous occasions between October 2017 and January 2019. These visits included various adjustments and recementing of the crowns, onlays, and veneers when they came off the teeth.

Regarding teeth numbers 8 and 9, Dr. Kim first made Krantz a "diagnostic wax-up" of the proposed veneers, so that Kratz could see and feel how the veneers would fit before they were placed because, as reflected in Dr. Kim's chart, Krantz was concerned about how the veneers would look. Krantz tried the "wax-up" between November 1, 2017 and January 10, 2018, during which time Dr. Kim made adjustments to them, including so that they would not interfere with Krantz's lower lip because he complained of issues with his speech. Once Krantz was "very satisfied" with the "wax-up," he approved the creation of permanent veneers. After the final veneers were cemented in January 2019, Krantz approved their "esthetics." A week later, he returned for the recementing of the veneer on tooth number 9.

In August 2018, Krantz returned to Dr. Kim because the veneer on tooth number 9 had come off while he was eating. Dr. Kim recommended removing the veneers and applying crowns for additional retention, and Dr. Kim placed crowns on these teeth in September 2018.

Krantz returned a month later and reported that he did not like how the crowns looked. The chart from that day also notes inflamed gums around the crowns. Dr. Kim removed the original crowns and placed new crowns on teeth numbers 8 and 9 in November 2018. Dr. Kim told the laboratory to use the previous impression from the veneers because Krantz liked the shape of the veneers. Krantz does not dispute that prior to placing the crowns on teeth numbers 8 and 9 on November 14, 2018, Dr. Kim "went over the shape and shade of the crowns with [Krantz] and [Krantz] approved the crowns."

## II.     The Parties and the Complaint

Krantz filed this lawsuit in May 2019, alleging a single cause of action of general negligence against Del Dental Group, Dr. Kim, and Dr. Shahrzad Fattahi Zarrinnam, DDS.[2]

The complaint alleged that the defendants were "negligent in the preparation and treatment of [Krantz's] two upper front teeth for veneers, which were filed too small to hold veneers," "resulting in the ability only for crowns on teeth numbers 8 [and] 9." The complaint also alleged that the defendants "were negligent in the preparation of his teeth for the crowns" because another dentist told Krantz that Dr. Kim was "negligent in the preparation of [the] teeth for crowns" and the teeth were "filed improperly." The complaint further stated that when Krantz went to defendants for treatment he had "substantial teeth to work with, [and] Defendants simply filed away all of his teeth until there was nothing left to attach the veneers to, and filed his

---

[2]     Although the parties do not explain who Dr. Zarrinnam is, it appears from the record that he is a member or owner of Del Dental Group, and his name is listed as the provider for Krantz on the treatment plan.

4

back teeth too much and uneven so that the crowns cannot hold." As to the upper front teeth, Krantz also claimed that the crowns were mismatched in color to his other teeth, too thick, and caused his upper lip to be irritated and his mouth to droop on the left side. Krantz alleged that he visited defendants for care over 40 times and that defendants caused him "pain and suffering" and "emotional distress from the facial disfigurement."

## III. Defendant Dr. Kim's Motion for Summary Judgment

Dr. Kim moved for summary judgment in February 2021, contending that Krantz could not establish two of the four elements of his negligence claim. Specifically, he argued that his actions met or exceeded the standard of care and that no negligent act or omission by Dr. Kim caused or contributed to Krantz's injuries.

### A. Declaration of Dr. Edmond Hewlett

In support of his motion for summary judgment, Dr. Kim submitted a declaration from Dr. Edmond Hewlett, D.D.S., a board-certified prosthodontist in Southern California who practices dentistry and is also a professor in the Division of Restorative Dentistry at the University of California, Los Angeles.

Dr. Hewlett reviewed Krantz's treatment records, images, and photographs from Del Dental Group; Krantz's responses to various discovery requests; Dr. Zarrinnam's responses to various discovery requests; records and radiographs from Pacific Dental Care; other subpoenaed records from various other dentists, a hospital, and dental insurance; Krantz's deposition transcript; and Dr. Kim's declaration in support of summary judgment.

5

### 1. Opinions on Standard of Care

Dr. Hewlett opined that Dr. Kim's dental care and treatment was at all times within the standard of care. He opined that when Krantz first visited Dr. Kim his teeth were in poor condition and that Dr. Kim created an appropriate "conservative" treatment plan that allowed for future treatment if the recommended treatment was unsuccessful; that recommending veneers and onlays as a first step for some teeth was appropriate due to the poor condition of the teeth because it would allow for future crowns if these treatments were unsuccessful; that the teeth that were given crowns right away had little natural tooth remaining, so the crowns were appropriate; and that Dr. Kim used high quality material for all restorations, which was within the standard of care. Dr. Hewlett also concluded that there was no evidence that Dr. Kim removed an unreasonable amount of tooth structure during his preparation for restorations, that restorations falling out is a risk of treatment, and that restorations can and do fall out absent any negligence by a dentist. Dr. Hewlett opined that in this case they likely fell out because of the poor condition and minimal tooth structure with which Krantz first presented at Dr. Kim's office, and that Krantz's teeth grinding habit could have also contributed to the failure of the restorations. Dr. Hewlett also opined that Dr. Kim's follow up attempts to address Krantz's dental complaints were within the standard of care, citing that Dr. Kim tried a different kind of cement, recommended that veneers be converted to full crowns for additional retention, and that existing crowns be "splinted" to increase retention.

Dr. Hewlett further opined that Dr. Kim's treatment of upper front teeth numbers 8 and 9 was within the standard of care because he proceeded in a "pain-staking and step-wise manner" by first using wax try-ups, which he had Krantz wear for a period of time and made adjustments to before placing final veneers, and discussed the shape and shade with Krantz and obtained his approval before doing the final restorations. He opined that when the veneers failed, it was appropriate to place crowns after obtaining his approval, also noting that Krantz never complained to Dr. Kim about the shape and shade of these crowns and approved the "esthetics of the crowns prior to delivering them."

## 2. Opinions on Causation

Regarding causation, Dr. Hewlett specifically opined that in his professional experience to a reasonable degree of dental probability, no negligent act or omission by Dr. Kim caused any injury to Krantz. Dr. Hewlett opined that Krantz's "teeth were in poor condition when he presented to Del Dental," citing the findings and treatment recommendations of Dr. Beigi as to teeth numbers 14, 18, 30, and 31, but also the records from when Krantz first presented at Del Dental showing that Krantz ground his teeth, was missing teeth, and had chipped teeth. Dr. Hewlett opined that these findings suggest, together with the pre-treatment radiograph, that the teeth were "weakened due to missing tooth structure." According to Dr. Hewlett, "weak[ening] and lack of tooth structure can contribute to failure of restorations. Grinding can also cause restorations to fail. To a reasonable degree of dental probability, it is more likely than not that it was plaintiff's preexisting dental condition that caused his restorations to fall out and require recementation and/or

7

fail . . . ."

Regarding the crowns on the two front upper teeth (teeth numbers 8 and 9), Dr. Hewlett opined that a dentist cannot guarantee that restorations will match natural tooth structure and that Dr. Kim was not negligent, to a reasonable degree of dental probability, because he reviewed the shape and shade of the crowns with Krantz and obtained his approval from Krantz before applying the final crowns. He also opined that the shape of these crowns "would and dentally could not cause his lower lip to droop, as plaintiff claims."

## IV.    Plaintiff's Opposition to Summary Judgment

Krantz opposed Dr. Kim's motion for summary judgment, arguing (1) lack of informed consent to specific treatment; (2) inadequate treatment planning and execution of treatment; (3) overtreatment of the upper front teeth; (4) failure to adequately access the teeth and plan treatment; and that (5) expert testimony by Dr. Missirlian created a triable issue of material fact. Krantz specifically contended that Dr. Kim's treatment was below the standard of care and caused him injuries and damages, stating that teeth numbers 18, 30, and 31 "were extremely broken down and required crown lengthening, root canal and post buildups to restore them," the onlay was not executed correctly on tooth number 14, and teeth numbers 8 and 9 were overtreated because they did not need veneers or crowns.

Nowhere in his opposition did Krantz contend that Dr. Kim failed to meet his initial burden as the moving party. Nor do the parties point us to any evidentiary objections by Krantz to Dr. Hewlett's declaration, or any trial court ruling on such an objection.

8

## A. Declaration of Dr. Donald Missirlian

In support of his opposition to summary judgment, Krantz submitted a declaration by Dr. Donald Missirlian, D.D.S., a board-certified prosthodontist. Dr. Missirlian practices dentistry in Southern California and is a professor of Preventative and Restorative Dentistry at Arthur A. Dugoni University of the Pacific School of Dentistry.

Dr. Missirlian reviewed Krantz's treatment records and images from Pacific Dental Care and Del Dental Group; Dr. Kim's responses to various discovery requests; Dr. Zarrinnam's responses to various discovery requests; Krantz's responses to various discovery requests, and Dr. Kim's declaration in support of his motion for summary judgment.

Dr. Missirlian's declaration nowhere directly opines on causation. He has opinions and conclusions scattered throughout sections titled "Notes," "My findings from records review," "Damages and discussion," "Comments on Edmond R. Hewlett, DDS," and "Violations of Standard of Care."

### 1. Opinions on "Violations of Standard of Care"

Dr. Missirlian explicitly opined that Dr. Kim violated the standard of care. He cited inadequate treatment planning and execution of treatment. His declaration includes the following criticisms: every restoration, except that on tooth number 8, came off, "most on multiple occasions"; failure to "deal[] with periodontal disease and referral to a periodontist and lack of documentation"; "[o]vertreatment. Upper front teeth #8 and 9 did not require veneers or crowns"; no offer of a "splint"; X-rays that failed to show the "apex" of some teeth; Dr. Kim's suggestion of leaving a crown off tooth [number 18] was below the standard of care because of periodontal disease and exposed dentin; lack of

9

periodontal charting; inaccurate charting in probing and recording a non-existent tooth; failure to inform and offer extraction of certain teeth that should have been extracted; the need to re-bond many restorations in general; and "inept dental care."

## 2. Remaining Opinions

Although not specifically tied to an opinion on the duty of care, or causation (the sole issue before us), Dr. Missirlian further opined in his declaration that there was: "inadequate follow up and inadequate amount of time from root planning to restorative treatment"; "Dr. Kim made no mention of crown lengthening, root canals or posts. It is obvious and apparent that when onlays began coming off that Mr. Krantz would have been better off following the treatment plan of Pacific Dental Care. Del Dental's treatment was incomplete and did not address the core issues"; that teeth numbers 8 and 9 had "glistening, natural enamel which has now been destroyed. The treatment could have just been smoothing the chipped edges and, at most, a mesial-incisal composite on [number] 9" ; teeth numbers 8 and 9 "could have kept tooth structure with just smoothing and polishing. A conservative, small composite restoration was optional;" Krantz is "not happy with the change from natural teeth to crowns [on numbers 8 and 9] and has spent the last years with crowns that are very large, do not blend or look anything like natural teeth they were replacing, and irritate his lower lip"; "upper third molars should have been extracted"; teeth numbers 30 and 31 did not have "clinical crown structure sufficient to retain a restoration"; "Krantz is correct in that the upper teeth support the lower lip"; and Dr. Kim made various poor suggestions to Krantz that he never carried out and made inaccurate charts.

10

From reviewing the photographs and X-rays from when Krantz first visited Dr. Kim in March 2017, Dr. Missirlian also opined that the teeth showed "severe erosion, chemical looking like from bulimia, soda, or citrus," "minor chipping and wear on front teeth [numbers] 8 and 9"; that teeth numbers 18, 30, and 31 were "extremely broken down and required crown lengthening, root canal, and post buildups to restore them."

The only time Dr. Missirlian directly mentions Dr. Kim causing any injury to Krantz in his declaration is when he states that "there is no reason why an onlay [on tooth number 14] was not retained if executed correctly. Most likely, operator error caused debonding."

## V.    Dr. Kim's Reply

In reply, Dr. Kim argued that (1) nowhere in Dr. Missirlian's declaration did he state his opinions to a reasonable medical probability, so Krantz failed to establish a triable issue of fact on causation; and (2) Dr. Missirlian's opinions were conclusory and irrelevant, lacked factual support and foundation, and failed to establish causation. Dr. Kim also filed 31 evidentiary objections to Dr. Missirlian's declaration.

## VI.   The Trial Court's Decision

On April 20, 2021, the trial court granted Dr. Kim's motion for summary judgment. It found that Dr. Kim met his burden as the moving party. It then determined that Krantz failed to adequately oppose summary judgment because Dr. Missirlian's declaration did not opine or offer any explanation as to how Dr. Kim caused or contributed to Krantz's injuries to a reasonable medical probability.

The trial court overruled the majority of Dr. Kim's evidentiary objections to Dr. Missirlian's declaration.

11

It sustained only three objections (objections 6, 12, and 14) because Dr. Missirlian did not establish independent knowledge of the facts.[3] Krantz, on appeal, does not claim any error in these rulings, asserting that the remaining evidence is sufficient to show that the trial court erred in failing to find a material dispute of fact on causation.

Krantz timely appealed.

## DISCUSSION

The sole issue before us is whether Dr. Missirlian's declaration opined on causation to a reasonable medical probability such that the trial court erred in finding no triable issue of fact.[4]

## I. Summary Judgment Standard and Standard of Review

A defendant moving for summary judgment must show " 'that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to the cause of

---

[3] The three objections it sustained were: (1) objection 6, a statement attributed to Krantz about what Dr. Kim told him about a "Maryland Bridge," and to which Dr. Missirlian stated he needed to wait to see the "bridge" to reach a conclusion; (2) objection 12, a statement attributed to Pacific Dental Care about a referral to an endodontist for infected gums; and (3) objection 14, statements attributed to what Dr. Hewlett said in part of his declaration.

[4] In his opening brief, Krantz also argues that there is a triable issue of fact as to breach of the duty of care, but the trial court did not grant summary judgment on that issue, which Krantz explicitly recognizes in his opening brief. Dr. Kim also only opposes this appeal on the issue of causation, citing the trial court's judgment against Krantz only on that issue.

action.'  (Code Civ. Proc., § 437c, subd. (p)(2).)   Summary judgment is appropriate where 'all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' [Citation.]"  (*Fernandez v. Alexander* (2019) 31 Cal.App.5th 770, 778 (*Fernandez*).)

"On review of a summary judgment, the appellant has the burden of showing error, even if he did not bear the burden in the trial court.  [Citation.]"  (*Claudio v. Regents of the University of California* (2005) 134 Cal.App.4th 224, 230 (*Claudio*).)

"On appeal, 'we take the facts from the record that was before the trial court . . . [and] " '[w]e review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' " ' [Citation.]"  (*Fernandez, supra*, 31 Cal.App.5th at p. 778.)  We do not consider evidence that the trial court properly excluded to determine whether a triable issue of fact exists.  (*Regents of Univ. of California v. Superior Court* (2018) 4 Cal.5th 607, 618.)  We liberally construe the evidence presented by the party opposing summary judgment, and resolve doubts in favor of that party.  (*Ibid.*; *Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347.)  " '[D]e novo review does not obligate us to cull the record for the benefit of the appellant in order to attempt to uncover the requisite triable issues.  As with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error and, therefore, to point out the triable issues the appellant claims are present by citation to the record and any supporting authority.  In other words, review is limited to issues which have been adequately raised and briefed.' "  (*Claudio, supra*, 134 Cal.App.4th at p. 230.)

13

## II.  Applicable Law on Expert Opinions

"Under California law, causation 'in a personal injury action . . . must be proven within a reasonable medical probability based upon competent expert testimony.' [Citation.] The reasonable medical probability standard mirrors the more-likely-than-not standard of proof in general negligence actions. [Citation.]" (*Kline v. Zimmer, Inc.* (2022) 79 Cal.App.5th 123, 129.)

" 'When the moving party produces a competent expert declaration showing there is no triable issue of fact on an essential element of the opposing party's claims, the opposing party's burden is to produce a competent expert declaration to the contrary.' [Citations.]  'The same rules of evidence that apply at trial also apply to the declarations submitted in support of and in opposition to motions for summary judgment.  Declarations must show the declarant's personal knowledge and competency to testify, state facts and not just conclusions, and not include inadmissible hearsay or opinion.' [Citation.]  'The declarations in support of a motion for summary judgment should be strictly construed, while the opposing declarations should be liberally construed.  [Citation.]  This does not mean that courts may relax the rules of evidence in determining the admissibility of an opposing declaration.  Only *admissible evidence* is liberally construed in deciding whether there is a triable issue.' [Citation.]" (*Fernandez, supra*, 31 Cal.App.5th at p. 779.) This means that the declaration of the party opposing summary judgment is " 'entitled to all favorable inferences that may reasonably be derived,' " from the declaration.  (*Id.* at p. 782, quoting *Hanson v. Grode* (1999) 76 Cal.App.4th 601, 607.)

14

" ' "[W]hen an expert's opinion is purely conclusory because unaccompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion, that opinion has no evidentiary value because an 'expert opinion is worth no more than the reasons upon which it rests.' " '[Citation.] 'Regarding causation, "the plaintiff must offer an expert opinion that contains a reasoned explanation illuminating why the facts have convinced the expert, and therefore should convince the jury, that it is *more probable than not* the negligent act was a cause-in-fact of the plaintiff's injury." ' [Citation.]" (*Fernandez, supra*, 31 Cal.App.5th at p. 781.)

## III. Dr. Missirlian's Declaration Does Not Establish a Material Dispute of Fact That Dr. Kim Caused The Alleged Injuries to a Reasonable Medical Probability

Krantz contends that Dr. Missirlian's declaration establishes a triable issue of fact on causation, so the trial court erred in granting summary judgment on this element of negligence. We disagree.

Krantz's allegations of negligence fall into two general categories: (1) Dr. Kim's negligence in preparation and treatment caused his restorations to debond or otherwise fail, except for the veneer on tooth 8; and (2) Dr. Kim's negligence caused Krantz to have crowns on his two front teeth that are mismatched in color to his other teeth, too thick, and cause his upper lip to be irritated and his mouth to droop on the left side. We address each category in turn.

### A. Debonding and Failure of the Restorations

Nowhere does Dr. Missirlian state in a nonconclusory fashion that it is more likely than not (or otherwise opine to a reasonable medical probability) that Dr. Kim's act or omission

15

was the cause of the debonding or failure of any of the restorations. In his entire declaration, Dr. Missirlian directly opines that Dr. Kim "likely . . . caused" Krantz an injury on only one occasion, when he declares, "there is no reason why an onlay [on tooth number 14] was not retained if executed correctly. *Most likely*, operator error *caused* debonding." (Italics added.) This conclusory statement lacks evidentiary value, and thus does not create a triable issue of fact, because it fails to provide a reasoned explanation connecting any facts to the conclusion that it was "most likely" Dr. Kim's "error" caused the debonding. (*Fernandez*, *supra*, 31 Cal.App.5th at p. 781.)

In his opening brief, Krantz argues that various other statements by Dr. Missirlian also opine on causation, and do so to a reasonable degree of medical certainty, but the declaration does not support this contention. We have already described Dr. Missirlian's declaration in detail. (See part IV.A, *ante*.) We now examine each statement Krantz cites in turn.

Krantz first points to Dr. Missirlian's statement that "Dr. Kim made no mention of crown lengthening, root canals or posts. It is obvious and apparent that when onlays began coming off that Mr. Krantz would have been better off following the treatment plan of Pacific Dental Care. Del Dental's treatment was incomplete and did not address the core issues." Dr. Missirlian later elaborates: "It is a dentist's responsibility that sufficient tooth exists to retain crowns before beginning restorative treatment. Therefore, Pacific Dental Care offered root canals, posts, and crown lengthening. Dr. Kim ignored this and therefore failed." He further opines that teeth numbers "18, 30, 31 were extremely broken down and required crown lengthening, root canal, and post buildups to restore them," and teeth numbers

16

30 and 31 did not have "clinical crown structure sufficient to retain a restoration."**5**

Taking all reasonable inferences from these opinions in Krantz's favor as we must (*Fernandez, supra*, 31 Cal.App.5th at p. 782), Dr. Missirlian is opining that there was insufficient tooth structure to retain the crowns on teeth numbers 18, 30, and 31, so Dr. Kim should have done root canals, posts, and lengthening on these teeth before applying crowns. First and foremost, Dr. Missirlian never opines that these alleged omissions by Dr. Kim were *more likely than not the cause* of the debonding of the crowns. He never provides a reasoned explanation illuminating why the facts have convinced him, and therefore should convince the jury, that "in the absence of the defendant's negligence, there was a *reasonable medical probability* the plaintiff would have obtained a better result." (*Alef v. Alta Bates Hospital* (1992) 5 Cal.App.4th 208, 216, italics added.) Or, as we stated in *Fernandez*, where the plaintiff's claim is that a medical professional caused the injury by recommending one course of treatment instead of another, the plaintiff's expert is required to opine on whether the defendant's course of treatment caused the alleged injury to a *greater degree* than the treatment he allegedly should have chosen. (See *Fernandez, supra*, 31 Cal.App.5th at p.

---

**5**    Relatedly, Krantz claims that Dr. Hewlett in his declaration "ignores th[e] central issue of what needed to be done to prepare Steven's teeth which were in poor condition and lacking in structure to retain restorations." But Krantz never argued in his opposition to summary judgment that Dr. Kim failed to meet his initial burden as the moving party through the evidence in the Dr. Hewlett declaration, and it is far too late to do so now. (See *Fernandez, supra*, 31 Cal.App.5th at p. 780.)

781.) Dr. Missirlian thus needed to opine that placing crowns without first doing "root canals, posts and crown lengthening" on teeth numbers 18, 30, 31 more likely than not caused the crowns to fail to a greater degree than if he had first performed these tasks.[6] Additionally, Dr. Missirlian did not opine that first ordering "root canals, posts and crown lengthening" was the standard of care before applying a crown when the teeth were in the condition they were here, such that not taking those steps caused the injury to a medical probability. (Cf. *Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 128 [medical expert opined that standard of care required a doctor to order an MRI upon a patient presenting with the plaintiff's specific symptoms and to act on the results of the MRI immediately, and declaration showed that the doctor never confirmed the results of the MRI, so the declaration created a triable issue of fact on causation].)

Next, Krantz points to Dr. Missirlian's statement that there was "inadequate follow up and inadequate amount of time from root planning to restorative treatment." This statement is

---

[6] Dr. Missirlian also does not explain why his recommended approach is different from that of Dr. Beigi's (at Pacific Dental Care), despite stating that it was preferred. Krantz stated it was "undisputed" that Dr. Beigi recommended "root canals with posts" and "crowns" on teeth numbers 14 and 18, and also noted that tooth number 18 might need extraction. It is also undisputed that Dr. Beigi recommended "root canals" for teeth numbers 30 and 31, or in the alternative, "extraction" of those teeth and "implants." Dr. Missirlian does not explain the basis for his assertion that it was "crown lengthening, root canal, and post buildups" that should have been done, and thus Dr. Kim was negligent for these omissions. Nor does Dr. Missirlian explain why Dr. Kim was negligent for failing to employ treatment options that Krantz had rejected with Dr. Beigi.

18

conclusory and therefore without evidentiary value. It fails to explain what about the follow up and the amount of time between "root planning" and treatment was "inadequate." Similarly, Dr. Missirlian opined that there was a failure to deal with periodontal disease and no referral to a periodontist, but, again, these statements are not linked to a "reasoned explanation illuminating why the[se] facts have convinced the expert, and therefore should convince the jury, that it is *more probable than not* the negligent act was a cause-in-fact of the plaintiff's injury." ' [Citation.]" (*Fernandez, supra*, 31 Cal.App.5th at p. 781.)

Krantz also cites Dr. Missirlian's opinion that the two upper front teeth were "overtreated," and "could have just been [treated by] smoothing the chipped edges and, at most, a mesial-incisal composite on #9." Yet, again, this is conclusory. He does not explain how Dr. Kim's choice to place veneers was "overtreatment" as opposed to different treatment, nor does he assert that "smoothing" and a "mesial-incisal composite" would have had a better outcome as to debonding, as he is required to do. (*Fernandez, supra*, 31 Cal.App.5th at p. 781 [expert needs to assert that alternative treatment plan would have had a better outcome].) Dr. Missirlian does not, for example, explain what a mesial-incisal composite is and why it would not have debonded the way one of the veneers did, nor why it is not "overtreatment" compared to a veneer.[7] (We address Krantz's additional asserted

---

[7]     Dr. Missirlian's statements are also seemingly contradictory: At one point he declares that the two upper front teeth were "over reduced"—without providing any measurements to explain this conclusion—but then states that a "millimeter or two of reduction is not an issue, particularly [for] teeth of these

19

injuries relating to these two teeth (the aesthetic and physical comfort injuries) in part B, *post*.) Dr. Missirlian's simple suggestion of another treatment plan, without more, is insufficient to create a triable issue of material fact. (*Fernandez, supra*, 31 Cal.App.5th at p. 781.) Moreover, "[a] difference of medical opinion concerning the desirability of one particular medical procedure over another does not, however, establish that the determination to use one of the procedures was negligent." (*Clemens v. Regents of Univ. of California* (1970) 8 Cal.App.3d 1, 13.)

Krantz next points to Dr. Missirlian's conclusions that Dr. Kim's charting and X-rays were inadequate in various ways, but Dr. Missirlian never opines on how these inadequacies caused or contributed to the restorations failing or debonding, let alone resulting in causation to a medical probability.

Dr. Missirlian also points to various other suggestions by Dr. Kim that he disagrees with, but that Dr. Kim never actually carried out. For example, the suggestion to leave a tooth without a crown, and a failure to suggest the extraction of various teeth. But Dr. Missirlian never explains how these suggestions caused or contributed to Krantz's injuries to a reasonable medical probability.

Finally, Dr. Missirlian opined that there was a lack of "proper informed consent" to the treatments because Krantz only signed a financial document, a claim that Krantz relied upon in opposing summary judgment.[8] On appeal, Krantz does not argue

---

age. As teeth age there is the advantage of increased reduction potential for retention."

[8] The complaint did not contain allegations of inadequate consent. Defendants moving for summary judgment need

20

he did not consent to the treatment and therefore Dr. Kim was negligent. He argues only that one cannot "choose negligent care." Moreover, there is no mention of lack of consent as the basis for an injury in the complaint.

In sum, Dr. Missirlian's declaration fails to opine that any acts or omissions by Dr. Kim were more likely than not the cause-in-fact of the debonding of the restorations. Ultimately, while Dr. Missirlian was "critical of Dr. [Kim's] treatment . . . [he] did not actually offer an expert opinion that it was a substantial factor in causing plaintiff's injuries within a reasonable medical probability." (*Chakalis v. Elevator Solutions, Inc*. (2012) 205 Cal.App.4th 1557, 1572.) While Dr. Missirlian's declaration is entitled to all favorable inferences that we may reasonably derive from it, and must be "liberally construed," "these principles in no way eliminate the need for some form of 'reasoned explanation.' " (*Fernandez*, *supra*, 31 Cal.App.5th at pp. 779, 782.) Dr. Missirlian's declaration did not create a material dispute of fact that Dr. Kim caused the failure of the restorations to a reasonable medical probability.

---

address only the issues raised by the complaint, and plaintiffs may not bring up new issues in their opposing papers. (*Kanovsky v. At Your Door Self Storage* (2019) 42 Cal.App.5th 594, 601.) "Summary judgment proceedings usually are limited to the issues framed by the pleadings. [Citation.] However, courts are encouraged to take a liberal approach in determining the scope of the pleadings, so long as those pleadings provide adequate notice to the opposing party of the theories on which relief is generally being sought." (*Jones v. Awad* (2019) 39 Cal.App.5th 1200, 1211.)

## B. Appearance and Physical Discomfort of Crowns on Teeth Numbers Eight and Nine

The remaining injuries alleged in the complaint relate to the appearance and physical discomfort caused by the crowns on Krantz's two upper front teeth (teeth numbers 8 and 9).

In his declaration, Dr. Missirlian opines as follows on these injuries: (1) "#8 and 9 were beautiful teeth with glistening, natural enamel which has now been destroyed. The treatment could have just been smoothing of the chipped edges, and, at most, a mesial-incisal composite on #9. He is not happy with the change from natural teeth to crowns and has spent the last years with crowns that are very large, do not blend or look anything like natural teeth [that] they were replacing and irritate his lower lip."[9] Dr. Missirlian concludes teeth numbers 8 and 9 were "beautiful God-given teeth, ruined by Dr. Kim," but also states that the photographs from when Krantz first presented to Dr. Kim showed "minor chipping and wear."

As detailed in part III.A. *ante*, Dr. Missirlian never directly opines that his proposed alternative plan of treatment for teeth numbers 8 and 9 was superior to Dr. Kim's plan of veneers, but that is the reasonable inference from a liberal construction of his declaration. Still, more is required. (See *Fernandez, supra*, 31 Cal.App.5th at p. 781 [expert needed to opine that defendant's

---

[9] Dr. Missirlian does not mention Krantz's mouth or lip drooping, as alleged in the complaint, nor does Krantz mention it in his briefing, so we do not address it. Similarly, Dr. Missirlian does not state that teeth numbers 8 and 9 were "filed too small," another injury alleged in the complaint, and, as noted *ante* in footnote 6, he states that filing of teeth of this age is acceptable up to a "millimeter or two."

course of treatment caused the alleged injury to a *greater degree* than the treatment he allegedly should have chosen].) Dr. Missirlian does not provide any factual reasoning or explanation. He does not state the polishing and "mesial-incisal composite" would have been more aesthetically pleasing and less physically irritating than the veneers and subsequent crowns, while still fixing the pre-existing problems in those teeth. For example, one is left to wonder how a "mesial-incisal composite on #9" would look or feel as opposed to a veneer, and thus why it would have been a better course of treatment. Krantz cannot simply rely on a conclusory statement without factual predicate to create a triable issue of fact as to causation. (*Id.* at p. 782.)

Moreover, in opposing summary judgment, Krantz did not dispute the evidence presented by Dr. Kim that prior to placing the crowns on teeth numbers 8 and 9 on November 14, 2018, Dr. Kim "went over the shape and shade of the crowns with [Krantz] and [Krantz] *approved* the crowns." (Italics added.) Krantz stated that this fact was "undisputed" when he opposed summary judgment. Dr. Hewlett opined that by reviewing the shape and shade of the crowns with Krantz before placing them, and by obtaining his approval, Dr. Kim acted within the standard of care and therefore did not cause or contribute to any injuries stemming from the appearance or feel of the crowns to a reasonable medical probability. Dr. Missirlian did not directly dispute this opinion; rather, he proffered the conclusory statement that there was "[n]o proper informed consent. Mr. Krantz signed a financial document. He did not sign anything that he was informed of the treatment he was to receive." But Dr. Missirlian did not rebut Dr. Hewlett's opinion that Dr. Kim acted within the standard of care, nor directly opine

23

that the standard of care required written consent stating he was "informed of the treatment." Dr. Missirlian would have had no personal knowledge to contradict Krantz's concession in his summary judgment opposition that Krantz approved the shape and shade of the crowns with Dr. Kim.

Dr. Missirlian's declaration did not create a triable issue of fact as to Dr. Kim contributing to or causing, to a reasonable medical probability, the aesthetic and physical discomfort injuries in the upper top two teeth alleged in the complaint.

## DISPOSITION

The judgment of the trial court is affirmed. Dr. Kim is entitled to costs on appeal.

HARUTUNIAN, J.*

We concur:

STRATTON, P. J.

WILEY, J.

---

* Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

24